[Civ. No. 28569. Second Dist., Div. Three. Oct. 14, 1966.]

FRANK DONAHUE et al., Plaintiffs and Appellants, v. ZIV TELEVISION PROGRAMS, INC., et al., Defendants and Appellants.

Cantillon & Cantillon and James P. Cantillon, for Plaintiffs and Appellants.

Trippet, Yoakum & Ballantyne, and F. B. Yoakum, Jr., for Defendants and Appellants.

KAUS, J.—After a jury had awarded plaintiffs a verdict in the sum of $250,000, the exact amount of their prayer, the trial court granted defendants' motions for a judgment notwithstanding the verdict and for a new trial. The latter order was based on the insufficiency of the evidence. Plaintiffs appealed from the judgment and the order. Defendants cross-appealed. (Cal. Rules of Court, rule 3(a).)

The theory of plaintiffs' case was this: before and during the year 1955 they conceived an idea for a television format which they entitled "The Underwater Legion."[1] Sometime in 1955 they submitted the format in written form, together with 12 story outlines, one screenplay and a proposed budget to defendant Ziv Television Programs, Inc. It was expressly and impliedly agreed between the plaintiffs and Ziv that if Ziv used the plaintiffs' format, it would pay for it. At that time defendant Tors was a producer, employed by Ziv and shooting segments of a series called "Science Fiction Theatre." In 1956 and 1957 defendants Ziv and Tors started to produce a television program entitled "Sea Hunt" which "used, exploited and utilized" plaintiffs' format and story outlines. The show was first shown to the public in 1958. Plaintiffs never received any compensation.

Defendants denied many of the details concerning the submission, but as will presently appear, we are not concerned with that conflict in the evidence. In the main, defendants put on a fairly impressive case to the effect that the idea for "Sea Hunt" was independently conceived by Tors. On appeal they urge that their evidence to that effect is so strong that the judgment notwithstanding the verdict must be upheld on the authority of *Teich* v. *General Mills, Inc.*, 170 Cal.App.2d 791 [339 P.2d 627]. They also argue that there is no similarity between any "protectible" portion of plaintiffs' material and "Sea Hunt," that there is no evidence of any express contract between Ziv and plaintiffs, no evidence of any

---

[1]Actually plaintiff Donahue had the basic idea, plaintiff Ross later joined forces with him "refining" it, and plaintiff Webb had helped Donahue create the "presentation." Webb sold his interest to Donahue and Ross in 1957 for $1,100, apparently before defendants' television series went on the air and became a success.

contract express or implied between Tors and plaintiffs and none that plaintiffs' format and story outlines had any market value.

The issues presented by the cross-appeal will be discussed later.

Both parties, very sensibly, make certain concessions. Plaintiffs, though not abandoning their appeal from the order granting a new trial, recognize that, there being substantial evidence in support of defendants' case, any attempt to urge error in making that order would be futile. (*Gunn* v. *President Tank Lines, Inc.*, 163 Cal.App.2d 615, 617-618 [329 P.2d 1003].) Defendants admit that for the purpose of testing the correctness of the judgment n.o.v. certain conflicts in the evidence must be disregarded. Thus, defendants state in their brief and we agree: ''We must accept as a basic premise that sometime in 1955 one or more of the plaintiffs had meetings with Gordon, a ZIV vice president, and submitted to him the material testified to by plaintiffs; namely, Exhibits 1 and 2 (being numerous story outlines, budget and a script of 'Rendezvous at Point Charlie'). . . .''[2]

If we could agree with defendants that *Teich* v. *General Mills, Inc., supra,* 170 Cal.App.2d 791, compels a finding that ''Sea Hunt'' was independently conceived by Tors, we could avoid the other issues, but we cannot so agree. In *Teich* the plaintiff submitted a scheme to include a kit for making sun pictures as a premium with defendant's product. Defendant later distributed its product with a very similar kit. After analyzing the evidence concerning the submission the court said: ''We must recognize therefore the existence of an inference of copying and use of plaintiff's idea.'' A judgment notwithstanding the verdict was nevertheless affirmed, the court holding that defendant's evidence to the effect that it did not use plaintiff's idea, but a similar one submitted by an advertising agency, was '' 'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved. . . .' '' (*Ibid.* p. 799.) (See *Leonard* v. *Watsonville Community Hospital,* 47 Cal.2d 509, 515 [305 P.2d 36].)

Just where testimony becomes ''clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved'' is, of course, a matter of judgment. In *Teich* it appeared to the court that the nature of defendant's testi-

---

[2]Exhibit 3 is also entitled ''Rendezvous at Point Charlie'' but is a rather different version of the script submitted. Exhibit 3 formed the basis of plaintiffs' pilot film.

mony, coming in large part from third parties, had the requisite qualities. There was correspondence, stipulated to be genuine, which clearly indicated that General Mills got the idea for the kit from the advertising agency. In the present case the defense is not nearly as compelling. Without in any way intimating our own evaluation of the evidence—we have already indicated that the defense had an impressive case—it simply does not measure up to the quality of the evidence in *Teich*. To a very large extent Tors' recital of his interest in underwater backgrounds was uncorroborated. Some of the written material he produced to prove this interest could have been gathered after the event. His testimony differed sharply on certain points with that of plaintiffs' witnesses, whom the jury evidently believed. There is no need to further detail the vulnerability of the defense. We are quite satisfied that the judgment cannot be affirmed on the basis that independent conception was conclusively proven.

We therefore must meet the issue of whether there was substantial evidence that defendants used plaintiff's material.

Two slightly different versions of the suggested format were before the jury. The differences are so trifling that it will suffice to copy only one:

"PRESENTATION . . . UNDERWATER LEGION"

"Underwater Legion is a world organization of hand picked men who have dedicated their lives to the sea. Divers all, each one a specialist in a chosen field. They live and fight to keep the seas clean.

"Johnny Neptune is the head of the International Organization of the Underwater Legion. On all jobs, he takes on personally, Bomber—a big ex-frogman and the strong man of the outfit—is Johnny's right hand man. And together with Mike—a young prototype of Johnny—they make an unbeatable trio.

"Their home is the flagship 'Courageous', a large seagoing vessel which is equipped with every modern aid for traveling on or beneath the surface of the sea. The 'Courageous' has aqua-lungs and heavy diving suits, 3 stage and single stage compressors, radio homing devices and compasses, and underwater radio.

"The 'Courageous' also has a little sister ship, the 'Dolphin', a fast two engine cruiser that works with it. The 'Dolphin' can outrun any ship afloat.

"The 'Courageous' and 'Dolphin' usually lie at anchor in the harbor at San Pedro and a constant radio and sonar watch

is kept on the bridge. The Underwater Legion is always in touch with the central council of the United Nations, and all local law enforcement agencies in the world. This makes the background for our stories world-wide."[3]

No comparable format of "Sea Hunt" was before the jury and it therefore has to be reconstructed from various episodes of the series which are in evidence.

It appears to us that a jury could easily find that the format of "Sea Hunt" is quite similar. The list of differences is shorter than that of the similarities. The differences are: Mike Nelson, the hero, is not the head of an organization, but operates alone. However, he cooperates with other organizations, and in one episode we viewed, he trains a Florida police department to become an effective underwater police force. There are no counterparts to "Bomber" and "Mike." Nelson operates from a single boat, rather than two, and it lies at anchor at Marineland, rather than San Pedro.

The strongest similarity between "The Underwater Legion" and "Sea Hunt" lies in the "gadgetry," the use of various types of equipment for operating under water, which in turn necessitates the extensive use of underwater photography. Although underwater photography was by no means novel in 1955, the idea of a television series featuring such photography, together with use of diving equipment in an adventure series could be found to have been original.

Before 1955 skin diving had become a popular sport. It was the idea of plaintiffs that a television series which would capitalize on the increased interest in underwater life and activities could be a success. ▮ An idea which can be the subject matter of a contract need not be novel or concrete. (*Chandler* v. *Roach*, 156 Cal.App.2d 435 [319 P.2d 776].) It may be valuable to the person to whom it is disclosed simply because the disclosure takes place at the right time. The success of "Sea Hunt" tends to prove that somebody, whether it be plaintiffs or Tors, submitted a valuable idea to Ziv. Whether Ziv used plaintiffs' format or Tors' is another

---

[3]Strangely, neither the complaint nor plaintiffs' contentions incorporated in the pretrial order specifically claim that the format just copied was part of the submission; rather they refer to the 12 outlines, the budget and the script. It is true, however, that an almost identical format is part of the script. Defendants at no point objected to the variance between the pleading and the proof, nor do they raise any such issue on appeal. They obviously are not prejudiced. (*Desny* v. *Wilder*, 46 Cal.2d 715, 750-751 [299 P.2d 257]; *Gudelj* v. *Gudelj*, 41 Cal.2d 202, 211-212 [259 P.2d 656]; *Chelini* v. *Nieri*, 32 Cal.2d 480, 486 [196 P.2d 915].)

question, but certain evidence of similarities between some "Sea Hunt" episodes and parts of the 12 outlines and the screenplay submitted by plaintiffs may have suggested to the jury that "Sea Hunt" was based on plaintiffs' format.

Only length, but little else, would be added to this opinion were we to set down in detail what these similarities are. Those concerned know what we refer to.[4]

We do not imply that the outlines were protectible literary property or that there was any copying as to form or manner of expression. It is just that there are enough similarities in basic plot ideas, themes, sequences and dramatic "gimmicks" that a jury might well have thought that plaintiffs' format and outlines had been submitted to Ziv as asserted by them and that it was their format which was the inspiration for "Sea Hunt," rather than Tors' alleged original idea.

Defendants' argument that "there is no substantial evidence that defendants kept or used any protectible portion of plaintiffs' material" ignores that plaintiffs do not now claim that their material is protectible, in the sense that they can claim a common law copyright thereto. Their suit rests entirely on an express or implied promise to pay the reasonable value of the material, in other words, on a contract. The difference between these theories was noted in the dissent of then Associate Justice Traynor in *Stanley* v. *Columbia Broadcasting System, Inc.,* 35 Cal.2d 653, 674 [221 P.2d 73, 23 A.L.R.2d 216] ("The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract. Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed. That disclosure may therefore be consideration for a promise to pay"), developed in *Weitzenkorn* v. *Lesser,* 40 Cal.2d 778, 791, 792 [256 P.2d 947] and explained at length in *Desny* v. *Wilder,* 46 Cal.2d 715, 734, 740 [299 P.2d 257]. It is therefore useless to cite, as defendants do, such cases as *Burtis* v. *Universal Pictures Co.,* 40 Cal.2d 823 [256 P.2d 933], *Jacobs* v. *Medford,* 210 Cal.App.2d 164 [26 Cal.Rptr. 591], and others which were

---

[4]For the benefit of the parties and for the record we point to the following: 1. A strong similarity in the basic dramatic core of plaintiffs' exhibit 2 (Rendezvous at Point Charlie) and Sea Hunt script 20B (exhibit 10-C). 2. Similarities in basic theme and dramatic situations between plaintiffs' outline "The People's Business" (part of exhibit 1) and Sea Hunt film 1005 (exhibit 19). 3. Similarities between the theme of plaintiffs' outline "The Buggy on the Bottom" and one dramatic sequence in plaintiffs' outline "Deadline" (parts of exhibit 1) and Sea Hunt film No. 1032 (exhibit 21).

not contract actions. ▮▮ Here, plaintiffs suggested to Ziv that it would be profitable to produce an adventure television series based on the extensive use of diving equipment and underwater photography, with a male hero whose base of operations is a boat anchored in Southern California, but whose assignments take him into many different waters. To illustrate this idea they submitted 12 story outlines and one complete script. Defendants' television series follows the format in most of its important facets and some of their episodes contained situations which a jury might have difficulty in finding as being original with them. The evidence of use of plaintiffs' idea is ample.

It is argued that there was no evidence of any express contract as to Ziv and no evidence of any contract, express or implied, as to Tors. Thus, it is implicitly conceded that there is evidence of an implied contract with respect to Ziv. However, since there seems to be so much confusion between "implied in fact" contracts and those "implied in law" and further confusion between "express contracts" and "express promises" we will set forth the evidence as to each defendant.

Plaintiff Donahue testified to a series of meetings between himself and one Gordon, a vice president of Ziv in charge of talent, whose office was in Los Angeles. Ziv's home office was in New York as was its president, a Mr. John Sinn. Asked whether during those meetings there was any discussion concerning compensation, Donahue said that "no definite figures were mentioned, except that a deal would be worked out. . . ." Further: "Well, Mr. Gordon, at a meeting when Mr. Ross wasn't present, made an offer of 5% for Mr. Webb and myself and a job, 5% of the series that was to be done plus we'd both function under the Ziv Banner as employees." This offer was refused because it took no account of the plaintiff Ross.

Ross testified that at one of the meetings, when Gordon said that as far as he was concerned the series would definitely be done, subject to final approval from Mr. Sinn, Gordon said that the compensation would be "under a regular package deal that Ziv made with independent producers. . . ." No figures were mentioned.

Gordon testified that the initial meeting between himself, Donahue and Webb was arranged by Bill Shiffrin, an agent.[5]

---

[5]There is in evidence the office copy of a letter from Gordon to Shiffrin, dated March 28, 1955, in which Gordon purports to return to

He further testified as follows concerning that meeting: "A. And I told them, 'There are several types of deals. There is a royalty deal, royalty payment deal.' Q. What was that now—royalty payment deal? A. Yes. A percentage of profit deal, a personal service deal to be determined to what extent they could contribute to the project. Q. Let me get these slowly. A. Profit participation. Q. And the next deal? A. A personal service deal depending on what they could contribute to the project, and an outright buy-out deal which in many instances constitutes a capital gains [sic]. Q. You told them that? A. Yes, I did. I further told them that I had no authority to make a deal and I only could make a deal if New York authorized it. Q. All this was said at the first meeting? A. Yes. Q. There is no question in your mind about that? A. To the best of my knowledge." There is also evidence that Gordon forwarded what he received from plaintiffs to Sinn in New York "as a possibility for a series." Sinn returned the covering letter with a penciled memorandum on it: "Need more info! *How much*?"[6] (Our italics.)

As to Tors the following evidence is significant: Ross testified that after his last conversation with Gordon he met Tors on the Ziv lot. Tors said that he had heard about "Underwater Legion" and asked him a lot of questions about it. This was in 1955. Tors thought it was one of the freshest ideas to come along "and he wanted to get in on it." He asked whether he

Shiffrin the "prospectus" on "Underwater Legion." It contains the following paragraph: "Before our company can express further interest, I think we should sit down and talk about costs, etc. We would not be interested in just a distribution deal." From this letter the jury could have drawn several inferences favorable to plaintiffs: 1. that Gordon considered the meeting to have been one where plaintiffs had offered something valuable, although no agreement had been reached; and, 2. that plaintiffs, rather than Gordon, were telling the truth concerning the nature of the material submitted. Gordon's testimony was to the effect that all he had received from plaintiffs was a single sheet of paper containing three fragmentary story outlines with the words "Johnny Neptune" penciled across the top of the page; there was no format, no budget, no 12 outlines and no screenplay. Plaintiffs' format was entitled "Underwater Legion"; although Gordon explained that that title was used orally during the meeting, this explanation did not have to be believed and it may have struck the jury as curious that the letter should refer to the title written on a submission which Gordon says he never received. The jurors may also have felt that to dignify the piece of paper which Gordon says he did receive with the word "prospectus" was not in line with his further testimony that a prospectus is a "plan or format or outline of a proposed television series."

[6] If it was plaintiffs' submission which was sent to Sinn by Gordon, which submission contained a complete budget for the show, Sinn's query, "How much?" could be inferred to relate to the compensation for those who had submitted the idea.

could become a partner. A few days later Ross again met Tors on the Ziv lot. Approval from Sinn in New York was still expected. Tors told him that "New York had made him wait for months to get an okay and they would just keep him on the string this way." Tors then asked him whether any of his stories were conceivably suitable for the show which he was then producing for Ziv, "Science Fiction Theatre." It was then agreed that Tors would produce a free pilot film for "Underwater Legion" if Ross prepared a script for "Science Fiction Theatre." The script was furnished, but Tors called him two weeks later and said he did not like it. He never produced the pilot film for plaintiffs.

A pilot film was produced by plaintiffs themselves in the spring of 1956. A few months thereafter, according to the plaintiff Donahue, he and Tors first met on the ocean off Avalon.[7] In the course of that conversation Tors said that he had seen the plaintiffs' pilot film, thought it was a very good idea and that he would like to produce the series. Donahue said that he was associated with Ross as a producer. Tors replied that they could forego Ross' participating and work with Tors and that he would then see that Ziv bought the property because he, Tors, was a known functioning producer. Donahue declined. During that meeting Tors also confirmed that he had already talked to Ross. After this conversation Donahue demonstrated various types of underwater equipment including a submarine which he had along.

Tors confirmed meeting Ross on the Ziv lot. Ross told him that he had an idea for an underwater television pilot film. Tors said: "This is very close to my heart because I have been working for many years on underwater research. . . ." He engaged Ross to do an underwater script for "Science Fiction Theatre," with the idea that if it was good, a new underwater series could be developed from that one episode. He never received such a script.

Tors became the producer of "Sea Hunt." His compensation was "5% of the gross" plus a salary in connection with the production of each episode.

*Desny* v. *Wilder*, 46 Cal.2d 715 [299 P.2d 257], lays down several rules:

1. Recovery for the use of an idea must be based on a true contract which the court, were it not for precedent (*ibid.* p.

---

[7]This is corroborated by Tors as far as the fact of the meeting is concerned. The conversation is, however, denied. Donahue later testified that he had shown the pilot film to Gordon at Ziv and left a copy there.

735), would prefer to call an express contract, which may be proved by either express promises or by ''circumstantial evidence.''[8] (*Ibid.* p. 738, fn. 9.) The court recognizes, however, that usage and the Civil Code (§ 1621) have established the term ''implied-in-fact'' for express contracts proved by circumstantial evidence.

■ 2. These contracts are to be distinguished from ''implied-in-law'' contracts or quasi-contracts which are imposed by the law for the purpose of bringing about justice without reference to the intention of the parties. (*Ibid.* p. 735.)

3. There are, however, certain situations where the law will recognize a true contract, although the transaction is not consensual. Examples are given on page 736 of the opinion, such as Professor Williston's buyer who goes into a store, is told the price of an article, takes it and says: ''I decline to pay the price you ask, but will take it at its fair value.'' Such a buyer is held liable for the price asked.[9]

■ 4. Recovery for the use of an idea must be based either on an express or an implied-in-fact contract. (*Ibid.* pp. 732-34.) This had already been established in *Weitzenkorn* v. *Lesser*, 40 Cal.2d 778, 789, 791-792 [256 P.2d 947]. The law will not imply a promise, never made expressly or impliedly, to pay for something which defendant can have for the taking.

■ 5. An express promise to pay for the conveyance of an idea which the promisor finds valuable, will be enforced although the promise is made after the conveyance, and strictly speaking the consideration for such a promise is

---

[8]In *Weitzenkorn* v. *Lesser*, 40 Cal.2d 778, 794 [256 P.2d 947], the court said: ''The only distinction between an implied-in-fact contract and an express contract is that, in the former, the promise is not expressed in words but is implied from the promisor's *conduct*.'' (Italics ours.) To speak of ''conduct'' rather than ''circumstantial evidence'' is probably more precise since the distinction between express and implied-in-fact contracts does not lie in the method of proof but the manner in which the terms of the contract are manifested. (Civ. Code, §§ 1620, 1621.)

[9]If we accept the modern theory that contracts are formed not because there is a ''meeting of the minds,'' but because the parties' objective words and acts are themselves the basis of contractual liability, rather than evidence of the required state of mind, it is evident that such contracts are not in a separate category at all. Indeed, the two articles referred to by the Supreme Court in *Desny* v. *Wilder*—Williston, *Mutual Assent in the Formation of Contracts*, 14 Ill. L.Rev. 25, and Costigan, *Implied-in-Fact Contracts and Mutual Assent*, 33 Harv. L.Rev. 376—agree that these ''no-meeting-of-the-minds express contracts'' are true contracts. Since California does accept the objective theory of contract formation—*King* v. *Stanley*, 32 Cal.2d 584, 591 [197 P.2d 321]—we believe that the formulation of the difference between express and implied in fact contracts of *Weitzenkorn* is more accurate than that of *Desny*.

"past," the promise being supported by moral consideration. (*Desny* v. *Wilder, supra,* at 738; Civ. Code, § 1606.)

6. If the discloser of the idea must rely on circumstances to prove a promise, the mere fact "that the idea has been conveyed, is valuable, and has been used for profit,". is insufficient. (*Ibid.* p. 739.) The circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances must furnish the evidence of a promise implied in fact. ". . . if the idea purveyor has clearly conditioned his offer to convey the idea upon an obligation to pay for it if it is used by the offeree and the offeree, knowing the condition before he knows the idea, voluntarily accepts its disclosure (necessarily on the specified basis) and finds it valuable and uses it, the law will either apply the objective test . . . and hold that the parties have made an express (sometimes called implied-in-fact) contract, or under those circumstances, as some writers view it, the law itself, to prevent fraud and unjust enrichment, will imply a promise to compensate." (*Ibid.* p. 739.)[10]

7. Although the purveyor of the idea conditions his offer to disclose on an obligation to pay for it, he to whom it is disclosed must have an opportunity to reject disclosure on the terms offered. "The idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power." (*Ibid.* p. 739.)

It seems clear to us that "the circumstances preceding and attending disclosure" support the implied finding of the jury that there was a contract as to Ziv. Admittedly, the first contact between Gordon and plaintiffs was through an appointment set up by Shiffrin, an agent. This fact alone must have indicated to Gordon that the persons whom the agent brought together with him were not social callers. The many instances where compensation was discussed between Gordon and the plaintiffs are strong evidence that Gordon realized all along that plaintiffs expected to be paid for their idea. Otherwise we would have to assume that although their undisclosed hope of being compensated came as a surprise to him and he

[10] We believe the last portion of the above quotation has caused at least one writer (Kaplan, *Further Remarks on Compensation For Ideas in California,* 46 Cal. L.Rev. 699, 711, fn. 48) to "confess to a lingering doubt" if in *Desny* the Court is not blurring the boundary between implied-in-fact and implied-in-law contracts which had been so clearly drawn in *Weitzenkorn.* We do not share this doubt. The language clearly refers to the type of true contract of which Professor Williston's buyer is an example.

was under no legal obligation to pay, he nevertheless, without demur, talked money.

With respect to Tors the situation is radically different. Although plaintiffs might have proceeded against him on various theories, such as breach of confidential relationship (*Thompson* v. *California Brewing Co.*, 150 Cal.App.2d 469, 474 [310 P.2d 436]) or inducing a breach of contract (*Imperial Ice Co.* v. *Rosier*, 18 Cal.2d 33 [112 P.2d 631]), they chose to proceed only on a breach of contract theory.[11] Construing the evidence most favorably, there is a submission to Ziv, an implied promise by Ziv to pay if the idea was used, and a later employment of Tors under circumstances which indicate that at the time of the employment Tors was aware of Ziv's obligation to plaintiffs. There is no evidence that he was a partner of or joint venturer with Ziv. He worked for Ziv on a salary plus a participation in the "gross." There is nothing to indicate that he was to share in the losses and no evidence that through his contract of employment he came to own any part of the protectible property rights which Ziv acquired in "Sea Hunt." While, if plaintiffs' evidence is believed in toto, Tors' conduct may appear morally reprehensible, we see no legal way of holding him liable for the debt of Ziv. One is perhaps bedazzled by the fact that Tors not only was an employee who agreed to produce the show knowing of Ziv's obligation, but that in addition he claimed—and the jury found the claim to be false—that the format was his own creation. Yet, to hold him liable because of that fact would be to punish him rather than to compensate plaintiffs on a theory put in issue. If the fact that Tors claims to have created the format is put aside, we can see no difference—at least on a contract theory—between him and, say, a cameraman who was hired on the same terms and who knew at the time of hiring that Ziv did not intend to keep its contract with plaintiffs. Nor can it make any difference that Tors already was an employee at the time plaintiffs negotiated with Gordon. It was not he who before or at the time of the submission impliedly promised to pay and certainly he, at no time, made any express promise; but even if we could torture his statements to Donahue and

---

[11]The complaint pleads that plaintiffs' submission was "confidential material." It is quite clear, however, that plaintiffs did not pursue Tors on any theory but express or implied contract. The only reference to a confidential relationship is a contention in plaintiffs' pretrial statement that "a confidential relationship existed between the plaintiffs and defendants [*sic*] Ziv Television Programs, Inc." No instructions on any theory other than contract were given or requested by plaintiffs.

Ross into evidence of some kind of a promise made at a time when to his knowledge the idea was still in the process of being submitted in confidence, it is plain that it was Ziv and not he who used it. The truth is that throughout this litigation plaintiffs never really developed a theory of liability as to Tors and that his status as the producer of "Sea Hunt" for Ziv and as its principal witness at the trial, in some undisclosed fashion persuaded everybody that his liability, in contract, was coextensive with that of his employer.

As we say, there may be theories on which Tors could have been pursued. Since we must reverse the judgment notwithstanding the verdict with respect to Ziv, it is very tempting to reach the same result with respect to Tors and suggest to plaintiffs that they move to amend their complaint. This we cannot do. If Tors were the only defendant, it could surely not be suggested that a correct judgment notwithstanding the verdict should be reversed to give plaintiffs a chance to try it all over again on a different theory.

Defendants claim that no contract could have been created because it was at all times made clear to plaintiffs that the decision whether or not to base a show on their idea was Sinn's, and that any deal would have to be authorized by him. To go along with that suggestion as justifying the judgment notwithstanding the verdict would be to hold that Gordon, a vice president, had less authority to bind Ziv than Billy Wilder's secretary had to bind Wilder and Paramount. (See *Desny* v. *Wilder, supra,* p. 745.) In any event there is evidence that Sinn made the decision to go ahead with "Sea Hunt."[12] Although defendants' evidence is that he did so when Tors revealed his idea to him, the jury did not have to accept that part. As far as the evidence to the effect that Sinn was the only person authorized to negotiate the exact terms is concerned, that is quite irrelevant in the present posture, as the law determines them. (*Cook* v. *Thomson,* 230 Cal.App.2d 866, 868 [41 Cal.Rptr. 323]; Civ. Code, § 1611.) The only way Sinn's asserted sole authority to deal with plaintiffs could be relevant would be by evidence that before disclosure of the idea to Gordon, it had been brought home to plaintiffs that Gordon's conduct "preceding and attending disclosure" was not what it appeared to be and that in making the disclosure they were taking a risk. If it is unfair, in an idea case, to bind

---

[12]Sinn did not testify at the trial. We do not believe that there is anything in the record to show whether he was then living and, if so, where.

the defendant to a contract without giving him an opportunity to reject the proffered disclosure, it is equally unfair to let the idea man make his disclosure under circumstances which reek of authority without giving him an opportunity to refuse disclosure to someone who has no actual power to deal.

The precise point in plaintiffs' dealings with Gordon when Gordon's asserted lack of authority was mentioned to plaintiffs is by no means clear from the record. We cannot, therefore, uphold the judgment notwithstanding the verdict on the basis suggested.

It is claimed that there was no substantial evidence that plaintiffs' material had any market value. Plaintiff Ross had been in the entertainment industry for 20 years at the time of the trial. He had made many films, although he had never produced or financed a television show. He gave his reasons for his opinion which put the value of the submission at $1,000,000.

Although ideas are not property, we see no reason why the person who conceives an idea which may be the subject of contract, should not be competent to testify to its value or, perhaps more accurately, to the value of his services in disclosing it. The rule which permits an owner to testify to the value of his property (*Long Beach City H. S. Dist.* v. *Stewart,* 30 Cal.2d 763, 772-773 [185 P.2d 585, 173 A.L.R. 249]) and also permits a party to testify to the value of his own services (*Coogan Finance Corp.* v. *Beatcher,* 120 Cal.App. 278, 280-281 [7 P.2d 695]) is ample justification for holding Ross to have been a competent witness to the value of the submission. It has been persuasively argued that the rule of law which permits the conveyance of ideas which are "as free as air" nevertheless to be the consideration for a promise to pay for them, can be justified on the theory that what is really bargained for are the services of conveying the idea. (Nimmer on Copyright, § 169.1) In *Desny* v. *Wilder,* 46 Cal.2d 715, 733 [299 P.2d 257] the Supreme Court said: "The lawyer or doctor who applies specialized knowledge to a state of facts and gives advice for a fee is selling and conveying an idea. In doing that he is rendering a service. The lawyer and doctor have no property rights in their ideas, as such, but they do not ordinarily convey them without solicitation by client or patient."

We cannot say that there was no evidence to support a judgment for plaintiffs in some amount. In any event, there would be little justice in affirming a judgment notwithstanding the verdict on the basis that the only evidence as to

damages, admitted over objection, was incompetent after all. If the trial court made a mistake in admitting Ross' testimony as to value—and we do not say that it did—it should not be able to turn around and grant a judgment notwithstanding the verdict on the basis that damages were not proven by legally competent evidence. Plaintiffs had a right to rely on the court's ruling. The proper remedy would be a new trial, which Ziv will, of course, have.

In closing this portion of our opinion, we note that we have tried to be very careful to state that the various issues discussed represented questions for the jury under the applicable principles of law. If at any point we have given the impression that plaintiffs are entitled to prevail on any issue as a matter of law, it was inadvertent.

In their cross-appeal defendants make several points. We will only discuss those which are likely to be problems at the next trial.

■■■ It is claimed that the trial court abused its discretion in refusing to allow an amendment to the answer which would have pleaded the bar of the two-year statute of limitations of section 339, subdivision 1 of the Code of Civil Procedure. It is further claimed that the uncontradicted evidence shows that the action would have been barred had the statute been pleaded.

Defendants filed their answer on July 18, 1960. The case was pretried on October 13, 1961, at which time it was set for trial for March 21, 1962. The trial date was thereafter continued from time to time. Defendants filed their notice of motion for an order allowing the filing of an amendment to the answer on July 8, 1963, at which time the case had been set for trial on July 30, 1963. The declaration of defendants' counsel which accompanied the notice of motion is set forth in full in the footnote.[13] *Thompson* v. *California Brewing Co.*, 191 Cal.App. 2d 506 [12 Cal.Rptr. 783], referred to in the declaration, had been decided on April 25, 1961, more than two years before the attempt to amend.

---

[13] "I am one of the attorneys for the defendants in the within matter. In the course of my preparation for trial, and upon reviewing the pleadings, it appeared to me that the causes of action in the Second Amended Complaint might be barred by the provisions of Cal. Code Civ. Proc. § 339(1), as that section was applied in *Thompson* v. *California Brewing Company*, 191 Cal.App.2d 506 [12 Cal.Rptr. 783] (1961). I therefore believe that in order to allow a full trial on the merits of the matter, defendants should be allowed to amend their Answer to raise this issue."

Another declaration set forth that on June 19, 1963, counsel for plaintiffs had been requested to consent to the amendment. This request was refused on June 28, 1963.

Under these circumstances we can not possibly say that the trial court abused its discretion in not allowing the amendment when defendants' first application was made or in similar rulings made at the beginning of and during the trial. While the facts in the present case are perhaps not quite as strong as those in *Moss Estate Co.* v. *Adler,* 41 Cal.2d 581 [261 P.2d 732], the language of the Supreme Court is in point, "The trial court was thus presented with a situation wherein defendant sought to file an amended answer alleging a new defense based on different facts on the eve of the trial more than a year after the original answer was filed and more than two months after she had notice of the date set for trial. Defendant was aware of the facts at the time the original answer was filed, but she gave no excuse for her delay. The original answer gave no inkling of the facts alleged in the proposed amended answer, and a continuance would have been required had leave to file been granted. Under these circumstances we cannot say that the trial court abused its discretion in denying defendant leave to file her proposed amended answer." (*Ibid.* p. 586.)

The statute of limitations would have injected an entirely new issue into the case. While it is true that the evidence in the present record is uncontradicted to the effect that Ziv and Tors made the first pilot film for "Sea Hunt" in November 1956, and the second pilot in January of 1957—the complaint was filed in June 1958—that may be due to the fact that the statute of limitations not being in issue, plaintiffs produced no evidence to the contrary.

Moreover, an entirely new legal issue would have arisen. We are not nearly as certain as defendants seem to be, that the making of two pilot films is the "use" for which defendants impliedly promised to pay. What if after making the pilot films Ziv had decided that the idea was not so good after all and shelved the project? In *Thompson* v. *California Brewing Co., supra,* the "use" which was held to start the running of the statute of limitations was a test advertising campaign along the lines suggested by the plaintiff, directed to the public, a campaign which the appellate court characterized as rather extensive. (*Ibid.* p. 509.) The first comparable use of "Sea Hunt" was the syndication of the program in January 1958, well within the statutory period.

We do not decide the legal question posed by the attempted plea. We merely point to it as justifying the trial court in exercising its discretion.

Nothing we have said is intended to preclude the trial court

from entertaining another motion to amend the answer and ruling on it in accordance with established legal principles in the light of the facts as they may then be made to appear.

Defendants make various contentions with respect to certain of their instructions which were refused and some of plaintiffs' which were given. Some of the problems they raise are not likely to recur at the next trial and some are disposed of by our discussion up to this point. We will limit ourselves to the remainder.[14]

Several of the instructions discussed by defendants refer to the significance of the alleged use by defendants of certain ideas in the script which Ross testified he gave to Tors, but which Tors said he never received. This script, in turn, was supposedly based on one of the 12 story outlines initially submitted by plaintiffs. In connection with this matter, defendants' proposed instructions and their criticism of the one that was given rest on two misconceptions: 1. the thought that because Ross testified that he gave the story to Tors, that fact is conclusively established against plaintiffs. The jury was entitled to disbelieve Ross and to believe Tors on that point.[15] (*Trembley* v. *Benedetti*, 134 Cal.App.2d 553, 555-56 [286 P.2d 426]; 9 Wigmore on Evidence, § 259a; McCormick on Evidence, § 243.) 2. the theory that Tors became the "owner" of the script, if Ross' version is true. It will be recalled that Tors supposedly had promised to make a free pilot film for "Underwater Legion" in return for the script, but that he said he did not like it when he saw it. If he nevertheless used it without furnishing the promised consideration—the pilot—it is by no means clear to us that he was free to do so.

Defendants requested an instruction to the effect that defendants were liable only if they used "novel" portions of plaintiffs' submission. That such an instruction is erroneous was established in *Chandler* v. *Roach*, 156 Cal.App.2d 435, 441-442 [319 P.2d 776]. As Professor Nimmer says in his great work: "Where there is an express contract for an idea which does not by its terms require that the idea in question be 'novel' there would seem to be no justification for a court to imply such a requirement. A person may well contract to pay for the disclosure of a non-novel idea, and even if the contract

---

[14]Since the case must be retried as to Ziv, it seems appropriate to say that our failure to discuss instructions which were given at the first trial but the propriety of which was not challenged by either party on appeal, does not imply approval.

[15]If Tors did not get the story from him, it could be inferred that he saw it in Ziv's hands as part of the submission.

does not expressly negate the requirement of novelty, it is not reasonable to assume that the purchaser necessarily sought or expected novelty. The fact that subsequent to disclosure the defendant *used* the idea in itself should indicate that he sought the idea regardless of its novelty.'' (Nimmer on Copyright, § 173.2.)

 Defendants requested an instruction to the general effect that in determining the value of plaintiffs' submission the jury was not entitled to include therein ''any value of the finished product which was achieved solely as the consequence of efforts expended by Ziv . . . the plaintiffs cannot recover for the enhanced value which their material acquired as a consequence of independent efforts and expenditures . . . by the defendants . . .'' During the trial defendants had successfully prevented the jury from learning how much money Tors had made getting his percentage of the gross of ''Sea Hunt.'' Plaintiffs' evidence as to value was not based on the value of ''Sea Hunt.'' Telling juries what they may *not* do is dangerous business and we do not question the wisdom of the trial court in refusing to instruct the jury that they could not include in their award something concerning which there was no evidence, but the value of which they might attempt to guess.

 Finally, defendants complain of the refusal of the court to give the instruction quoted in the footnote.[16] This instruction is a paraphrase of the language of the Supreme Court in *Burtis* v. *Universal Pictures Co.*, 40 Cal.2d 823, 832-833 [256 P.2d 933], a common law copyright case. In *Burtis*, the court was concerned with a comparison ''as to form and manner of expression.'' It only found similarities ''between parts of the basic dramatic core of each story.'' That being the case, no cause of action for plagiarism was proved. We are dealing with a contract to pay for the idea for a format, if used. An instruction which directed the jury to examine a ''story'' would have been entirely misleading. Plaintiffs' claim does not rest on similarities between stories and such similarities as we have mentioned were used by us merely to show that there was evidence that defendants received the

---

[16]''In determining whether similarity exists between the 'Sea Hunt' teleplay and plaintiffs' story or story outlines, you are not to apply the technique of dissection or expert analysis in an endeavor to locate isolated instances of similarity but you should examine the entire story in each instance to see whether one is similar to the other, and when the only similarities which appear are as the result of the dissection of the basic elements in each, there is no similarity of use which the law recognizes.''

format in the form testified to by plaintiffs and that Ziv used it.

The judgment notwithstanding the verdict is reversed as to Ziv and affirmed as to Tors. The order granting a new trial to Ziv is affirmed. The judgment notwithstanding the verdict as to Tors having been affirmed, the order granting a new trial as to him is not effective. (Code Civ. Proc., § 629.) The appeal from the order granting him a new trial is therefore dismissed as moot. The appeal by defendants from the judgment is also dismissed. (*Brignoli* v. *Seaboard Transportation Co.*, 29 Cal.2d 782, 792 [178 P.2d 445].)

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied November 9, 1966, and the opinion was modified to read as printed above. The petition of appellant Ziv Television Programs, Inc., for a hearing by the Supreme Court was denied December 7, 1966.