Thurman V. WHITFIELD, Appellant,

v.

Norman LEAR, Tandem Productions, Inc., TAT Communications Co., Topper Carew and Rainbow Television Workshop, Inc., Appellees.

No. 28, Docket 84–7361.

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1984.

Decided Dec. 14, 1984.

Thurman V. Whitfield, pro se.

Stephen F. Huff, New York City (Jamie M. Brickell, Pryor, Cashman, Sherman & Flynn, New York City, of counsel), for appellees.

Before OAKES and WINTER, Circuit Judges, and CLARIE, District Judge.*

WINTER, Circuit Judge:

Thurman V. Whitfield, *pro se*, appeals from a grant of summary judgment. 582 F.Supp. 1186. His complaint invoked a variety of legal theories arising from defendants' alleged misappropriation of ideas contained in a television script he authored. Because we believe that the similarities between appellant's script and the appellees' television series can be appraised only by comparing the actual scripts, many of which are not in the record, we reverse and remand.

BACKGROUND

During the years 1975 through 1977, appellee Topper Carew worked on a proposed television series called "The Righteous Apples." On August 29, 1977, he filed a sixteen page registration with the Writers Guild consisting of a brief description of the series, descriptions of the characters, and marketing and production information. The document describes "The Righteous Apples" as a situation comedy involving a multiracial rock band of six junior high school students aged 13 through 15. A seventh student is the group's business manager. A primary theme of the series is the interaction of youths in a multiracial setting.

Carew was president of defendant Rainbow Television Workshop. On February 3, 1978, Rainbow entered into an agreement with the Corporation for Public Broadcasting ("CPB") to determine the feasibility of producing a pilot film based on "The Righteous Apples." On December 19, 1978, CPB agreed to provide funding to produce a pilot, which was filmed but never aired. The shooting script for the pilot, entitled "The Righteous Apple Wrangle," is in the record. That script is a situation comedy involving the characters described *supra*, and the plot essentially traces the resolution of racial tensions between one of the band members and another student. An-

other pilot script, with similar characteristics, is in the record.

During this period, appellant Whitfield was also working on a format for a television series and eventually he copyrighted a script for a show entitled "Boomerang." This was a dramatic show about an interracial, crime-fighting rock band, called Boomerang. The band had five members, two white, one Spanish-surnamed, and two black. All five were recent graduates of the same high school where they had formed the band. In the "Boomerang" script, which is also in the record, the band members fight crime using their athletic talents and occasionally a boomerang as a weapon.

Following the copyrighting of "Boomerang," Whitfield added additional scenes to the script and circulated it to television producers. In March, 1979, he sent a mailgram to the defendant Norman Lear and his company, Tandem Productions, informing them that a script was forthcoming. Lear forwarded the mailgram to another company he controlled, defendant TAT Communications, and so informed Whitfield. In 1980–1981, a twenty-episode series entitled "The Righteous Apples," produced by Carew, was broadcast under CPB auspices. Whitfield contends that "The Righteous Apples" series differs from the original pilot script and that the series as actually broadcast bears a strong resemblance to "Boomerang," resulting from Carew's access to the latter script through Tandem Productions and his appropriation of the ideas contained therein.

On June 4, 1981, appellant commenced this action alleging federal and state claims and diversity of citizenship. His complaint alleged the following causes of action under California law:

(1) Breach of contract;

(2) Breach of confidential or fiduciary relationship;

---

* The Honorable T. Emmet Clarie, United States District Judge for the District of Connecticut, sitting by designation.

(3) Breach of implied covenant of good faith and fair dealing;

(4) Fraud and misrepresentation;

(5) Misappropriation and commercial piracy;

(6) Unfair competition;

(7) False designation of origin and false advertising;

(8) Restitution based on quasi-contract and unjust enrichment.

He also alleged copyright infringement under 17 U.S.C. § 501 and a violation of the Lanham Act, 15 U.S.C. §§ 1051–1127. Appellees moved for summary judgment, and both parties submitted affidavits. Appellees conceded access to Whitfield's script, and, apparently, their group involvement for Carew's series, solely for purposes of the motion. Judge Glasser granted the motion. The appellant, who was represented in the district court by counsel, prosecuted this appeal *pro se*.

## DISCUSSION

Appellant has never alleged that the appellees actually copied from his script, only that they misappropriated ideas contained therein. Such a claim does not implicate the federal copyright laws, and appellant withdrew his copyright and Lanham Act claims in the district court. He thus now relies solely on a variety of causes of action under California law.[1]

■ Appellant claims an interest in the ideas contained in his script and seeks redress for misappropriation of the ideas, not their literary or artistic expression. This theory narrows the legal grounds available for recovery even further. Under California law, the fraud, misappropriation, unfair competition, and quasi-contract claims are actionable only to vindicate legally protected property interests, and an idea is not recognized as a property right. *Weitzenkorn v. Lesser*, 40 Cal.2d 778, 789, 256 P.2d 947, 956 (1953) (en banc). Recovery for the appropriation of an idea, there-

fore, may be had only on a contractual theory. *See Donahue v. Ziv Television Programs, Inc.*, 245 Cal.App.2d 593, 601, 54 Cal.Rptr. 130, 137 (1966).

■ While an idea is not property and is not subject to copyright under California law, its disclosure may be valid consideration for a contract. There is no evidence of an express contract between Whitfield and any of the defendants. However, California law will imply a contract from the conduct of the parties in certain circumstances. Thus, if a producer accepts a submitted idea with full knowledge that the offeror expects payment in the event of use, California courts impose liability under a theory of implied-in-fact contract. *Desny v. Wilder*, 46 Cal.2d 715, 299 P.2d 257 (1956) (en banc). In that case, the plaintiff called Wilder, a writer/producer for Paramount Pictures Corp. and, when asked the purpose of his call by Wilder's secretary, told her of an idea he had for a motion picture. At the secretary's invitation, the plaintiff dictated a brief synopsis of his idea over the telephone. Following this disclosure, the plaintiff stated that he expected to be paid if the idea were used, and the secretary acknowledged that he would be. The California Supreme Court held these facts sufficient to survive defendant's motion for summary judgment in a suit alleging that the defendants had used the idea without payment. The court also set forth the circumstances in which a contract might be implied absent an express promise to pay:

[T]he idea purveyor cannot prevail in an action to recover compensation for an abstract idea unless (a) before or after disclosure he has obtained an express promise to pay, or (b) the circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances, show a promise of the type usu-

---

**1.** Ordinarily, a court will apply the law of the forum in which the use, if any, of plaintiff's work or ideas occurred. *Brown v. Cosby*, 433 F.Supp. 1331, 1336 (E.D.Pa.1977). Appellant claims that appellees' use of "Boomerang" occurred in California, and that California law applies. Appellees do not contest these claims.

ally referred to as "implied" or "implied-in-fact."

*Id.* at 738, 299 P.2d at 270 (footnote and citations omitted). California courts still follow the *Wilder* test. *See Klekas v. EMI Films, Inc.,* 150 Cal.App.3d 1102, 1114, 198 Cal.Rptr. 296, 304 (1984).

Appellees argue that, even accepting Whitfield's version of the facts surrounding submission of "Boomerang," there is insufficient evidence to support an implied contract. They rely upon the statement in *Wilder* that:

> The law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue.

46 Cal.2d at 739, 299 P.2d at 270.

■ In the instant case, Whitfield sent a mailgram to Lear and Tandem Productions informing them that a script was forthcoming and then sent the "Boomerang" script. An assistant to Lear wrote to Whitfield stating that, although Lear was not personally interested in "Boomerang," the mailgram had been forwarded to the Senior Vice President for Creative Affairs at TAT Communications. The parties had no further communications.

Whitfield contends that the custom in the television industry is that a studio or producer not desiring any outside submissions states so explicitly and, when a studio or producer is not interested in reviewing a particular script, the script is returned unopened. If, however, a studio or producer is notified that a script is forthcoming and opens and reviews it when it arrives, that studio or producer has by custom implicitly promised to pay for the ideas if used. *See* M. Nimmer, *Nimmer on Copyright* § 16.-05[c] (1984) (if recipient has advance warning of and opportunity to reject disclosure, and knows that person submitting expects payment, California law will infer promise to pay in the event of use).

We conclude that the communications in question and the allegation of custom in the industry are sufficient to withstand a motion for summary judgment on this point. In *Minniear v. Tors,* 266 Cal. App.2d 495, 72 Cal.Rptr. 287 (1968), the plaintiff produced a pilot film and permitted a television director to view it at the latter's request. The parties engaged in no negotiations. The director's company later produced an arguably similar television series. Based on the plaintiff's claim that "it is understood in the industry that when a showing is made, the offeror shall be paid for any ideas or materials used therein," *id.* at 500, 72 Cal.Rptr. at 291, the court held that a jury could infer that the defendant accepted the ideas with the knowledge that plaintiff expected payment.

The facts of the instant case are similar to *Minniear.* The correspondence between the parties, brief as it was, has some of the attributes of bargaining. Whitfield's mailgram described his experience as a radio broadcaster and his knowledge of the entertainment market. These statements were obviously designed to persuade the recipient to open the script and give it careful scrutiny. The letter from Lear's assistant stated that the Vice President for Creative Affairs at TAT Communications would contact him "should we be interested in accepting new material from writers outside of our organization." This is arguably an acknowledgment that Whitfield's ideas were not freely appropriable. If, as appellees argue, they were perfectly free to use Whitfield's ideas without compensation as soon as they received them, there was nothing to "accept," and no further communication with Whitfield was necessary. On the whole, the record raises a material issue of fact as to whether the appellees accepted Whitfield's submission on an understanding common in the industry that he expected payment if the ideas were used.

The appellant has a second hurdle to clear. To support recovery on an implied-in-fact contract, he must show not only access but also that the appellees actually used his ideas by demonstrating "some substantial similarity" between the ideas

and themes of the two programs. *Kurlan v. Columbia Broadcasting System*, 40 Cal.2d 799, 809, 256 P.2d 962, 969 (1953). Access having been conceded for purposes of the motion for summary judgment, the district court concluded that "there are *no* similarities between the ideas contained in defendant's production and plaintiff's work." Mem. at 9 (emphasis in original).

We are unable to verify this conclusion. The scripts of the actual episodes of "The Righteous Apples" that appeared on television are not in the record and were not reviewed by the district court. The only "Righteous Apples" scripts in the record are pilots prepared *before* appellant's submission of "Boomerang" to Lear. However, the essence of Whitfield's claim is that "The Righteous Apples" as televised differed significantly from the appellees' original pilots.

Since no scripts of the actually televised series are in the record, the critical comparison can be made only on the basis of other materials submitted by the parties. However, these materials are in utter conflict over the existence of similarities between the televised series and the "Boomerang" script. Appellees thus describe the first ten televised episodes of "The Righteous Apples" [2] in a manner wholly at odds with Whitfield's description of similarities between those episodes and his "Boomerang" script.[3]

2. Appellees offered the following synopses:

"THE RIGHTEOUS APPLES"
(SEASON I)
*Brief Synopses*

101 "JOSH'S RUN"                  Jim Tisdale
The RIGHTEOUS APPLES discover a once-famous seventy-five-year-old black blues guitarist vegetating in a nursing home. The RIGHTEOUS APPLES help him and his seventy-year-old ladyfriend marry and begin new, useful lives on the outside. This story is about cross-generational cooperation and geriatric love.

102 "WHO'S THE VICTIM?"        Louil Silas, Jr.
When two of the RIGHTEOUS APPLES are mistakenly identified as muggers, BIG NECK MCMORRIS withholds his alibi to protect the privacy of a suicidal girl, even when it's discovered that the hardnosed policeman handling the investigation is the girl's father.

103 "POINT OF VIEW"                Charles W.
                     Metcalf & Harvey Brenner
Everyone believes they saw meek and mild WINSTON, who is black, stab the assistant principal, but everyone is wrong. The RIGHTEOUS APPLES develop a plan to diffuse mounting racial tensions at Sherwin High by bringing forth the real culprit.

104 "BY HOOK"                       Sam Hefter
SANDY BURNS is desparate for money to buy a new outfit for a recording audition. When unemployment makes it impossible for her father to help with the expense, a clever pimp persuades the naive teenager that he holds the key to a bright future. All she has to do is "meet" a few of his friends. GLORETTA has a heart-to-heart discussion with SANDY on "the facts of life" and The RIGHTEOUS APPLES save their little sister from this ordeal.

105 "A.S.A.P."                       Sam Hefter
When the schedule of the RIGHTEOUS APPLES' roller disco dance clashes with a rally for the Knights of the White Light (a white supremacy group), the scheduling conflict leads the RIGHT-

EOUS APPLES' J.T. BONHAM to a head-to-head battle with the son of the Knights' leader.

106 "CONVICTIONS"              Johnny Dawkins
                          & Carole Kirschner
Unable to tell her parents that she's pregnant, J.T. BONHAM'S girlfriend has gone to a fly-by-night family-planning clinic for an abortion. When a doctor carelessly sterilizes her, the RIGHTEOUS APPLES, the girl's family and an investigative reporter unite to expose the truth. The RIGHTEOUS APPLES help J.T.'s girlfriend form a stronger bond with her parents.

107 "A DREAM FULFILLED"    Delle Chatman &
                          Louil Silas, Jr.
BIG NECK MCMORRIS organizes a tribute to Martin Luther King, but runs into unexpected opposition from his girlfriend, the disco-crazy daughter of a minister who marched with King.

108 "LOVE HAS TWO LEFT FEET"
          Harvey Brenner & Charles W. Metcalf
D.C. JUNIOR'S parents accept his new girlfriend's cerebral palsy, but reject her when they learn she isn't Jewish. To complicate the romance, D.C. becomes convinced that BIG NECK is horning in on his action.

109 "APPLE JUICE"               Harvey Brenner &
                          Charles W. Metcalf
MRS. KENT shares her hospital room with irritable, bigoted ELVA MITCHELL. SANDY BURNS lost her mother in the very same hospital and helps this terminally ill woman face death with grace.

110 "A SECRET LOVE"                Jim Tisdale
GLORETTA BENSON'S interracial romance with the son of a television producer is complicated by his disapproving mother and the discovery that the young man is half-black and "passing" for white.

3. Whitfield's affidavit states in part:
   .... [T]he synopses in Exhibit F appear to have been prepared for this litigation and do not accurately describe the themes in the

Assuming access by the defendants to the "Boomerang" script and accepting Whitfield's assertions regarding the content of the televised series as true, as we must on a motion for summary judgment, we conclude that the alleged similarities between the "Righteous Apples" series and "Boomerang," viewed in light of the earlier pilot scripts, are sufficient to allow a trier of fact to find that Whitfield's ideas were misappropriated under California law. There is thus dispute over material facts which can be resolved only by comparing the pilot scripts (in the record) prepared before the submission of "Boomerang," the Boomerang script (in the record), with "The Righteous Apples" scripts actually used in the televised series (not in the record). There were, therefore, insufficient grounds to grant summary judgment.

Reversed and remanded for further proceedings.

Scripts. Plaintiff's analysis of the first-season Scripts is set forth below.

26. Affiant read each of the ten Scripts listed under First Season ... and found that the nine Scripts which were aired had the following similarities to plaintiff's submission:

A. No comedic aspects indicated therein applicable to all nine Scripts.

B. No indications for laughter—applicable to all nine Scripts.

C. No use of the term "comedy", "sitcom" or "situation comedy"—applicable to all nine Scripts.

D. Serious drama—applicable to all nine Scripts.

E. 5 members in rock group—applicable to all nine Scripts.

F. The composition of males, females and ethnics—applicable to all nine Scripts.

G. Musical numbers performed or just performed—applicable to all nine Scripts.

H. The following Scripts had an investigation and/or fighting or exposing of corruption, drugs, death by mistreatment, crimes against old person or other crime(s), as indicated in parentheses: 101, "Josh's Run" (group performing in old folks' home; investigate corruption, drugs, assault of patients and death of one patient by mistreatment; director subpoenaed and flees before apprehended; witnesses interviewed by rock group); 102, "Who's the Victim?" (elderly woman badly beaten, robbed, attempted rape; attempted suicide by pregnant young girl; group member takes gun away and saves life; police arrest real criminals); 103, "Point of View" (investigate attempted murder and conspiracy to frame innocent high school student; group traps framers through tape recording and investigation; prove stabbing was accidental); 104, "By Hook" (criminal assault, prostitution, pimping, tries to get away from pimp, who beats her up; male members go after pimp and beat him up); 105, "A.S.A.P." (assault and civil rights violations, Klan-like racist group with cursing and vulgarity; group fights Klan-like group member; racist son sees the light); 106, "Convictions" (income tax evasion, investigations, abortion clinic, threaten to kill, drug use on daughter, attacks doctor; obtain evidence against the doctor through tape recording); 107, "A Dream Fulfilled"; 109 (aid to disco-crazed girl); 110, "Apple Juice" (visit hospital and help terminally ill woman face death with grace and better understanding of race relations).