[Civ. No. 34751. Second Dist., Div. Five. May 28, 1970.]

JULIAN BLAUSTEIN, Plaintiff and Appellant, v.
RICHARD BURTON et al., Defendants and Respondents.

164

## COUNSEL

Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Melville B. Nimmer, Bayard F. Berman and Sol Rosenthal for Plaintiff and Appellant.

Slaff, Mosk & Rudman, George Slaff, Norman G. Rudman and Richard C. Solomon for Defendants and Respondents.

## OPINION

**FRAMPTON, J.*—**

### Statement of the Case

Plaintiff, on November 14, 1967, filed his complaint against the defendants Richard Burton, Elizabeth Taylor Burton, Franco Zeffirelli, and Does I through X, wherein he sought damages for (1) breach of contract, (2) unjust enrichment, (3) breach of confidential relationship and (4) services rendered and benefits conferred. Answer to the complaint was filed by the Burtons on January 16, 1968, and no other defendant was served or appeared in the action.

On March 20, 1968, respondents (Burtons) took appellant's (Blaustein's) deposition, and on June 18, 1968, respondents filed their notice of motion for summary judgment based solely upon appellant's deposition. The motion was noticed for hearing on July 17, 1968, but by stipulation, hearing thereon was continued first to July 31, 1968, and ultimately to October 21, 1968.

On July 29, 1968, appellant filed his own affidavit and the deposition of Martin Gang, taken on March 26, 1968, in opposition to the motion. On October 17, 1968, respondents filed the declarations of Richard McWhorter and Norman G. Rudman, and the affidavit of Kenneth L. Maidment in support of the motion.

The matter was argued and submitted and the court announced its decision granting the motion on November 19, 1968. Motion for reconsideration was denied January 10, 1969, and summary judgment was entered in favor of respondents on January 16, 1969. The appeal is from the judgment.

### Statement of Facts

Appellant, in his deposition, testified that he had been in the motion picture business since 1935. After serving as a reader, a story editor, the head of a story department, and an editorial supervisor, he became a producer of motion picture films in 1949. The films he has produced include "Broken Arrow"; "Mr. 880"; "Half Angel"; "Just One More Chance"; "Take Care of My Little Girl"; "The Day the Earth Stood Still"; "The Outcasts of Poker Flat"; "Don't Bother to Knock"; "Desiree"; "The Racers"; "Storm Center"; "Cowboy"; "Bell, Book and Candle"; "The Wreck of the Mary Deare"; "Two Loves"; "The Four Horsemen of the Apocalypse"; and

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

"Khartoum." The functions of a producer of a motion picture are to (1) generate the enthusiasm of the various creative elements as well as to bring them together; (2) search out viable locations which would be proper for the artistic side of the production and would be proper from the logistic physical production side; (3) create a budget that would be acceptable from the physical point of view as well as satisfactory from the point of view of implementing the requirements of the script; (4) make arrangements with foreign government where the photography would take place; (5) supervise the execution of the script, the implementation of it onto film; (6) supervise the editing of all the production work down through the dubbing process and the release printing process, at least through the answer print process with Technicolor in this case; (7) the obligation of consulting with the United Artists people on advertising and publicity; (8) arrange casting; (9) engage the interests of the kind of star or stars that they (the United Artists' people) would find sufficiently attractive to justify an investment, and (10) develop the interest of a proper director.

During 1964, appellant conceived an idea consisting of a number of constituent elements including the following: (a) the idea of producing a motion picture based upon William Shakespeare's play "The Taming of the Shrew"; (b) the idea of casting respondents Richard Burton and Elizabeth Taylor Burton as the stars of this motion picture; (c) the idea of using as the director of the motion picture Franco Zeffirelli, a stage director, who at that time had never directed a motion picture and who was relatively unknown in the United States; (d) the idea of eliminating from the film version of the play the so-called "frame" (i.e., the play within a play device which Shakespeare employed), and beginning the film with the main body of the story; (e) the idea of including in the film version the two key scenes (i.e., the wedding scene and the wedding night scene) which in Shakespeare's play occur offstage and are merely described by a character on stage; (f) the idea of filming the picture in Italy, in the actual Italian settings described by Shakespeare.

On April 6, 1964, appellant met with Hugh French, an established motion picture agent who was then, and was at the time of the taking of the deposition (March 20, 1968), the agent for respondent Richard Burton. Prior to such meeting, appellant knew that Mr. French was Mr. Burton's agent and Mr. French knew that appellant was a motion picture producer, as appellant and Mr. French had been involved in business dealings together in the past. At such meeting, appellant first asked Mr. French "if he could tell me anything about the availability of Mr. and Mrs. Burton." Mr. French replied: "Well, they have many commitments; but, as you know, they are always interested in good ideas or good scripts or good projects."

Appellant then replied: "Well, I have a thought about a picture for the Burtons, but it makes no sense to discuss it unless you would be interested in it or unless you tell me that they would be available to consider a production beyond their current commitments." Mr. French responded: "No, indeed, I would like to hear what you have in mind." Appellant then said that he thought there would be something uniquely attractive at that time to do a film based on Shakespeare's "Taming of the Shrew" with respondents as the stars of the picture. Mr. French's reaction was "instantaneous and affirmative." Appellant then asked Mr. French if the idea had ever been previously discussed, and Mr. French replied no, that to his knowledge it had not been. Mr. French further stated that he would discuss appellant's idea with Mr. Burton, and would try to arrange a meeting in New York between appellant and the Burtons.

Thereafter, at Mr. French's suggestion and with tickets arranged for by Mr. French, appellant attended the opening of Mr. Burton's stage production of "Hamlet" in New York City on April 9, 1964. At that time, Mr. French introduced appellant to Mr. Burton as "the man who had been talking about Taming of the Shrew." Because of Mr. Burton's preoccupation with his stage production, it was not possible at that time for appellant to have a private meeting with the Burtons, so appellant proceeded on to London, where he was engaged in production work on another motion picture.

Upon arriving in London, appellant decided to explore the possibility of using the services of Franco Zeffirelli as the director of "The Taming of the Shrew" motion picture. Accordingly, on May 11, 1964, appellant met with John Van Eyssen, Mr. Zeffirelli's agent, in London. Appellant related his idea to Mr. Van Eyssen, and his disclosure thereof to Mr. French. To appellant's inquiry as to the possible availability of Mr. Zeffirelli, Mr. Van Eyssen replied "that he thought it was just a splendid idea, that he was absolutely certain that his client would agree with his reaction, but that he would telephone him in France and discuss it with him as quickly as he could reach him. . . ." Thereafter, appellant, together with Mr. Van Eyssen, met with Mr. Zeffirelli in Paris on May 22, 1964. Appellant there related his idea in some detail to Mr. Zeffirelli, and Mr. Zeffirelli's response was: "I can't tell you how much I would like to do it, but why would the Burtons accept me?" Appellant replied ". . . that is my job, to generate their enthusiasm for you, . . . [and] I think there is a very good chance of my persuading them to accept you."

On May 25, 1964, appellant, while still in London, telephoned to Mr. French in Los Angeles, suggested the idea of Mr. Zeffirelli acting as director of the proposed motion picture, told of the meeting with Zeffirelli, and suggested that this information be communicated to Mr. and Mrs. Burton.

The possibility of a meeting between appellant and Mr. and Mrs. Burton was also discussed in this telephone conversation. On May 27, 1964, appellant sent the following cable to Mr. French: "Leaving in few days. Please cable about Burton meeting so can plan New York stopover. Julian Blaustein." On May 30, 1964, Mr. French cabled the following reply: "Sorry for delay reply but as cannot give you definite answer suggest you return California most convenient route. If this via New York, will try to arrange meeting. Hugh." On May 31, 1964, Mr. French sent the following cable to appellant: "Now have definite reaction, Richard delighted meet you New York. Let me know when you expect arrive. Will try be there if you feel can help. Hugh." En route from London to Los Angeles, appellant stopped over in New York City until June 3, 1964. He was unable during this time to meet with Mr. and Mrs. Burton.

Upon his return to Los Angeles, appellant met with Martin Gang on June 25, 1964. Mr. Gang at that time was appellant's lawyer. Mr. Gang's firm was also the attorneys for respondents Richard Burton and Elizabeth Taylor Burton. Aaron Frosch, a New York lawyer, acted as general counsel for Mr. and Mrs. Burton. At the meeting between appellant and Mr. Gang, appellant disclosed his above described idea, and related his dealings up to that point with Mr. French. Appellant told Mr. Gang that "Mr. French has so far been unable to arrange a meeting" with Mr. and Mrs. Burton. Mr. Gang offered to attempt to arrange such a meeting. Mr. Gang thereupon phoned Aaron Frosch and informed him of appellant's desire to meet with Mr. and Mrs. Burton and of the reasons for such a meeting. Mr. Frosch stated that he believed that he could arrange such a meeting, suggesting that appellant phone him upon appellant's arrival in New York.

Upon his arrival in New York, appellant phoned Mr. Frosch's secretary on June 29, 1964, and was told to contact Richard Hanley, appointments secretary for Mr. and Mrs. Burton. Appellant did phone Mr. Hanley, who recognized him and stated "It looks fine. Richard and Elizabeth know you are here and we will get it set up as quickly as we can." On the afternoon of June 30, 1964, Mr. Hanley phoned appellant and said: "Can you come up to see them?" Appellant proceeded to Mr. and Mrs. Burton's hotel suite, was introduced to Mr. Burton by Mr. Hanley, and then met for a period alone with Mr. Burton. Later, Mrs. Burton joined them. At the beginning of the conversation between appellant and Mr. Burton regarding "The Taming of the Shrew," Mr. Burton commented upon what a good idea it was for Mrs. Burton and him to make such a motion picture, adding, "I don't know how come we hadn't thought of it."

After Mrs. Burton joined them, appellant explained in full his ideas regarding the proposed project. This included the use of Mr. Zeffirelli as

the director. Mr. Burton said of Zeffirelli "I think he is a marvelous idea. The idea of who directs this picture is naturally very important, and I just think you have made a very good choice. And you have met with him?", to which appellant replied in the affirmative. They then discussed the cost of the film, and of appellant's prior discussion with Mr. Zeffirelli relative to the cost area. Mr. Burton stated "Well, certainly with you as an experienced producer, you can contribute that part of it to him."

There then was a discussion of possible conflicting commitments, and Mr. Burton stated with reference to another project, "Well, look, we are not actually committed to that, and I do believe that could be pushed back anyway. This idea is such a good one and this picture is so important that we do it that I think we should plan on doing it. And we can try to juggle our other productions to fit this." Toward the end of the meeting, Mr. Burton stated, "Well, let's plan to go ahead now. Elizabeth and I would like to do this. We think Zeffirelli is a good idea. We will accept him. You tell me you have worked out a potential deal with him." Appellant had discussed Mr. Zeffirelli's connection with the proposal with Mr. Van Eyssen. Mr. Burton instructed appellant to work out appropriate arrangements with Aaron Frosch. The meeting ended with a mutual expression of looking forward to working together.

After the above meeting, and before appellant left the United States, he called Martin Gang in California from New York City. In this telephone conversation, he told Mr. Gang "Look, you do whatever you think is right about structuring a deal with Aaron Frosch, and you know I am not going to be difficult about my end of this because this is a very important picture to me and I don't want you to feel that we have got to fight with anybody, whatever might come up, about any fees and my participation and so forth. It's a picture I want very badly to do, and please keep me in touch." Mr. Gang replied, "Congratulations. I will get onto it right away and keep you informed."

Upon appellant's return to London, where he was working on another motion picture, he met with Mr. Van Eyssen and proceeded further with the negotiation of a deal for the services of Mr. Zeffirelli as director. Appellant reported progress made in these negotiations in a letter dated July 7, 1964, which he sent to Martin Gang.

On August 11, 1964, appellant received a phone call in London from Mickey Rudin, who was then a partner in Mr. Gang's law firm. Mr. Rudin worked in close contact with Mr. Frosch in connection with "The Taming of the Shrew." Mr. Rudin represented Mr. and Mrs. Burton in connection with "The Taming of the Shrew," and as far as Mr. Gang knows, has continued to

do so even after Mr. Rudin disassociated from the Gang firm. In the phone call of August 11, 1964, appellant asked Mr. Rudin what percentage share of the gross receipts from the motion picture "The Taming of the Shrew" appellant would receive if he were paid no guaranteed fee; what percentage share he would receive if he were paid a guaranteed fee of $50,000, and what percentage share he would receive if he were paid a guaranteed fee of $100,000. Mr. Rudin replied that he would think about it and let appellant know.

About November 27, 1964, appellant "felt that there was nothing to do but wait until the Burtons are in a position to and have an inclination to make a commitment."

On December 30, 1964, appellant met with Mr. Gang and Mr. Rudin in Mr. Gang's office in Los Angeles. At this meeting appellant learned that his position in the project was in jeopardy. At this time both Mr. Rudin and Mr. Gang advised appellant that he had no legal rights in the project, and appellant "simply accepted that."

In March 1965, a meeting was held in Dublin, Ireland, where Mr. Burton was filming another motion picture, attended by Mickey Rudin, among others. The meeting concerned "The Taming of the Shrew" project, including appellant's participation in connection therewith. Following this meeting, Mr. Rudin stopped off in London, en route back to Los Angeles, and on March 18, 1965, phoned appellant. In that phone conversation, Mr. Rudin stated to appellant that "[he] might not be the producer if the picture is ever made." Mr. Rudin further stated, "under any conditions, however, there would be a reward for your contribution to the project." On March 20, 1965, appellant addressed a letter to Messrs. Rudin and Gang in which he said in part: "There's no point rehashing the various elements involved; nor is there any point attempting to 'try the case,' particularly with my own attorney. I realize I must simply accept whatever Aaron Frosch and you agree is proper 'reward' for my contribution. But it's important to me, Mickey, that you understand I can never consider any such payment to be a satisfactory substitute for the function that has been denied me on a project I initiated." In conversations with Mr. Van Eyssen (face to face) and with Mr. Zeffirelli (via telephone) on March 25, 1965, appellant was advised that the suggestion that appellant not be the producer of the film had come from "the other side" and from "the Burton lawyer." Appellant understood this reference to be directed toward Mr. Aaron Frosch and so advised both Mr. Zeffirelli and Messrs. Gang and Rudin.

Upon Mr. Rudin's return to Los Angeles, he reported events at the Dublin meeting to his then partner, Martin Gang. Mr. Gang wrote to appellant on April 27, 1965, stating that Mr. Rudin had reported to him

that "there is no question in anybody's mind that this was your idea, of 'Taming of the Shrew' and bringing Zeffirelli in was your idea, and this is so recognized by all the principals, including Mr. Burton and Mr. Zeffirelli."

In December 1965, appellant heard rumors of a "deal" being made for the production of "The Taming of the Shrew" involving the respondents and was informed by Mr. Gang that discussions to this effect were then taking place with Columbia Pictures Corporation. In a letter to Mr. Gang dated January 3, 1965, but, in fact, written and sent on January 3, 1966, appellant suggested the possibility of informing Columbia of his participation in the project, noting that "Burton has acknowledged the obligation involved," and stating, "I should imagine Columbia wouldn't hesitite to acknowledge Burton's (and Zeffirelli's) obligation to me as an obligation of the production—provided it's discussed at the proper time, which is during the negotiations of the entire deal." Mr. Gang's response to this suggestion was to advise appellant against contacting Columbia since by doing so "he might upset the possibility of any deal being made because Columbia wouldn't want to get involved in litigation, and that if he wanted to get any rewards out of it for any reason, without giving any legal opinions, that it would be best not to upset that apple cart." Appellant did not communicate with Columbia.

Thereafter, a motion picture based upon William Shakespeare's play "The Taming of the Shrew" was produced and exhibited commencing in or about March 1967. The motion picture stars respondents Richard Burton and Elizabeth Taylor Burton, and is directed by Franco Zeffirelli. The motion picture was financed and distributed by Columbia Pictures Corporation, although at the time of taking Mr. Gang's deposition (March 26, 1968), the formal contract between Columbia and the respondents remained to be completed. Mr. Rudin has represented Mr. and Mrs. Burton in the negotiations with Columbia. The motion picture as completed utilizes the following ideas disclosed by appellant to respondents: (1) It is based upon the Shakespearean play "The Taming of the Shrew"; (2) it stars Elizabeth Taylor Burton and Richard Burton in the roles of Katherine and Petruchio, respectively; (3) the director is Franco Zeffirelli; (4) it eliminates the "frame," i.e., the play within a play device found in the original Shakespearean play, and begins with the main body of the story; and (5) it includes an enactment of the two key scenes previously referred to by appellant which in Shakespeare's play occur off-stage.

In addition, the film was photographed in Italy, although not in the actual locales in Italy described by Shakespeare.

Respondents have paid no monies to appellant, nor have they accorded him any screen or advertising credit.

Respondents, while not challenging the foregoing statement of facts, except to say that they do not acquiese in the claimed "characterizations" and "conclusions" contained therein, urge that critical facts have been omitted therefrom. These critical facts, according to respondents, as revealed by the record, are as follows: In connection with appellant's meeting on April 6, 1964, with Hugh French, motion picture agent for respondent Richard Burton, appellant, was, according to his own testimony, familiar with the function of an agent for an established star in the motion picture industry. Appellant was aware of the role usually played by an agent for an established star, which was to screen projects submitted to the star, in turn submitting them to the star for a determination of interest. If there is interest, the agent usually pursues it further on the star's behalf.

Appellant was aware that an agent for a major star cannot commit the star without the star's approval. This is the practice in very close to 100 percent of the cases and in that sense differs from other agencies. The "few cases" in which the star permits his agent to make commitments on his behalf "are very rare."

Appellant testified in his deposition that there is nothing unique about doing Shakespeare on the screen. It has been done many times. It has been done by leading stars of the calibre of Laurence Olivier. Respondent Richard Burton has himself previously appeared in a motion picture made of Shakespeare's "Hamlet." Shakespearean productions in motion picture form have been made in the United States, with leading stars, and also in England, the Soviet Union and other countries of the World.

Appellant testified that there is nothing unique about the idea of making a motion picture entitled "The Taming of the Shrew," based on Shakespeare's play of that title. Such has been done in the United States before the making of the film here in issue, and the earlier film featured in its leading roles (Petruchio and Katherine) stars who were then married to each other and who were perhaps the leading idols of the screen at the time, Mary Pickford and Douglas Fairbanks. The Pickford-Fairbanks film "The Taming of the Shrew" was done in the 1930's. The declaration of Norman B. Rudman filed in support of the motion disclosed that the earlier version of the film also (1) eliminated the "frame" (the play within a play device utilized by Shakespeare), and (2) depicted on screen the wedding night scenes which in the Shakespearean original occurs off-stage and are merely described by narration.

Appellant testified in his deposition that there was nothing unique or unusual about doing "The Taming of the Shrew" with two of the leading actors of the time, in the sense that it had been done once before, but "there was something unusual about the particular notion of doing it under other cir-

cumstances." There is nothing unique about a stage director of good repute coming directly from the stage to motion pictures and directing a major motion picture. Such has been done often in the past by such directors as Ruben Mamoulian, Josh Logan, Danny Mann, Orson Welles, Eliah Kazan, and by Mike Nichols, who directed the film "Who's Afraid of Virginia Woolf," which starred the respondents in its leading roles, as his first film production.

Appellant testified further in his deposition that there is nothing unique about a non-American director directing English speaking actors in a film. Zeffirelli speaks quite good English, was distinguished for his directorial work in the field of opera and had done many stage productions in different languages in Italy, France and England. Zeffirelli was well known and distinguished as a director of at least one Shakespearean production, "Romeo and Juliet," prior to his direction of the respondents in "The Taming of the Shrew."

Appellant testified further, by way of deposition, that he asked Mr. French to communicate with the Burtons to ascertain whether or not they would be interested in doing "The Taming of the Shrew." Appellant was interested in this from a business point of view so that he might have an interest in the film as a producer. One of appellant's objects was to negotiate a co-production or joint venture agreeement with respondents under which he would be engaged as producer of the film under specific terms and conditions, and respondents would be committed to star in the film, their services to begin on a given start date. Appellant's company and respondents or their company would be co-venturers and co-owners of the film. The negotiations did not result in a co-production or joint venture agreement.

Appellant testified further, by way of deposition, that his interest in the possibility of using the services of Franco Zeffirelli as director of the motion picture was based upon Zeffirelli's potential in contributing to the commercial success of the picture to such extent that appellant could point out its commercial potential to a possible distributor whose prime interest would be commercialism. The key elements of the picture, so far as appellant was concerned, besides the play itself, were Mr. and Mrs. Burton to play the leads. In appellant's letter of July 11, 1964, addressed to Mr. Martin Gang, his attorney, he stated that if Mr. Zeffirelli were not available as director of the film, respondent Burton might himself direct the film; the only requirement was that there be a top-flight director.

In appellant's first meeting with John Van Eyssen, Zeffirelli's agent, which occurred in London on May 11, 1964, he told Van Eyssen that interest in the project had been expressed by the Burtons' agent, and by the Burtons through their agent, but that nothing had been done beyond that and that

appellant had not yet met with the Burtons personally to discuss the subject. Appellant urged Mr. Van Eyssen to discuss the matter with Zeffirelli, but did not enjoin the former from discussing it with others as such an injunction is implict in any discussion with an agent. Before meeting the Burtons, ap-appellant had possibly discussed the matter of the picture informally with one David Chasman of United Artists.

When Mr. Gang, at appellant's request, telephoned Aaron Frosch on June 25, 1964, to assist appellant in obtaining an audience with the Burtons, Mr. Frosch had already known about the proposal of the Burtons doing a film "The Taming of the Shrew" because of appellant's approach to Mr. Zeffirelli, who was also a client of Mr. Frosch's office.

Appellant, since the meeting with respondents of June 30, 1964, has not seen them personally nor had any conversations with them. He has no written contract in connection with the proposed project signed by respondents, or either of them, or any agent of the respondents wherein he was promised the position of producer of the film "The Taming of the Shrew."

### Contentions on Appeal

Appellant urges that (1) there are triable issues of fact as to whether a contract was entered into between appellant and respondents pursuant to which appellant is entitled to compensation by reason of respondents' utilization of the idea disclosed to them by appellant; (2) there are triable issues of fact as to whether appellant is entitled to recover from respondents under quasi-contract for services rendered and benefits conferred, and (3) there are triable issues of fact as to whether appellant is entitled to recover from respondents for breach of a confidential relationship.

Respondents urge (1) that appellant's action is barred by the statute of frauds and the statute of limitations under California law; that the substantive law of the State of New York should be invoked in determination of the parties rights, and that under the application of the law of either state, appellant's claim is equally untenable; (2) there is no triable issue of fact raised by the declarations and affidavits, and (3) respondents were not unjustly enriched at appellant's expense, nor did respondents breach any confidential relationship such as to require the law to impose a quasi-contractual obligation upon respondents to pay any sums to appellant.

The issue to be determined by the trial court in ruling on a motion for summary judgment is whether or not the party opposing the motion has presented any facts which give rise to a triable issue or defense, and not to pass upon or determine the issue itself, that is, the true facts in the case. The facts alleged in the affidavits of the party against whom the motion

is made must be accepted as true, and that such affidavits to be sufficient need not necessarily be composed wholly of strictly evidentiary facts. ■ A summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain judgment in his favor, and his opponent does not by affidavit show such facts as may be deemed by the judges hearing the motion sufficient to present a triable issue of fact. ■ The affidavits are to be construed with all intendments in favor of the party opposing the motion. (*Desny* v. *Wilder,* 46 Cal.2d 715, 725 [299 P.2d 257].) ■ The use of depositions in support of, or in opposition to a motion for summary judgment is proper. (*Kramer* v. *Barnes,* 212 Cal. App.2d 440, 444 [27 Cal.Rptr. 895].) ■ In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. ■ Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining the facts. (*Wilson* v. *Bittick,* 63 Cal.2d 30, 34-35 [45 Cal.Rptr. 31, 403 P.2d 159].)

The rights of an idea discloser to recover damages from an idea recipient under an express or implied contract to pay for the idea in event the idea recipient uses such idea after disclosure is discussed in *Desny* v. *Wilder,* 46 Cal.2d 715, 731-739 [299 P.2d 257], as follows: *"The Law Pertaining to Ideas.* Generally speaking, ideas are as free as the air and as speech and the senses, and as potent or weak, interesting or drab, as the experiences, philosophies, vocabularies, and other variables of speaker and listener may combine to produce, to portray, or to comprehend. But there can be circumstances when neither air nor ideas may be acquired without cost. The diver who goes deep in the sea, even as the pilot who ascends high in the troposphere, knows full well that for life itself he, or someone on his behalf, must arrange for air (or its respiration-essential element, oxygen) to be specially provided at the time and place of need. The theatrical producer likewise may be dependent for his business life on the procurement of ideas from other persons as well as the dressing up and portrayal of his self-conceptions; he may not find his own sufficient for survival. As counsel for the Writers Guild aptly say, ideas 'are not freely usable by the entertainment media until the latter are made aware of them.' The producer may think up the idea himself, dress it and portray it; or he may purchase either the conveyance of the idea alone or a manuscript embodying the idea in the author's concept of a literary vehicle giving it form, adaptation and expression. It cannot be doubted that some ideas are of value to a producer.

"An idea is usually not regarded as property, because all sentient beings may conceive and evolve ideas throughout the gamut of their powers of

cerebration and because our concept of property implies something which may be owned and possessed to the exclusion of all other persons. We quote as an accurate statement of the law in this respect the following language of Mr. Justice Brandeis, dissenting in *International News Service* v. *Associated Press* (1918), *supra,* 248 U.S. 215, 250 [39 S.Ct. 68, 76, 63 L.Ed. 211, 225]: 'An essential element of individual property is the legal right to exclude others from enjoying it. If the property is private, the right of exclusion may be absolute; if the property is affected with a public interest, the right of exclusion is qualified. But the fact that a product of the mind has cost its producer money and labor, and has a value for which others are willing to pay, is not sufficient to ensure to it this legal attribute of property. The general rule of law is, that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas—become, after voluntary communication to others, free as the air to common use.' Of similar import, but stated negatively: 'The doctrine that an author has a property right in his ideas and is entitled to demand for them the same protection which the law accords to the proprietor of personal property generally finds no recognition either in the common law or in the statutes of any civilized country.' (34 Am.Jur. 402-403, § 5; 18 C.J.S. 143, § 10e; cf. *Golding* v. *R.K.O. Pictures, Inc.* (1950), 35 Cal.2d 690, 693-697, 702, 711-712 [221 P.2d 95]; *Burtis* v. *Universal Pictures Co., Inc.* (1953), 40 Cal.2d 823, 831 [256 P.2d 933]; *Kurlan* v. *Columbia Broadcasting System* (1953), 40 Cal.2d 799 [256 P.2d 962].) Whether the theory upon which this court sustained recovery in the *Golding* case may properly be classed as a property rights theory is not clear (see pp. 694-695 of 35 Cal.2d and pp. 831, 836-837 of 40 Cal.2d) but it is clear that California does not now accord individual property type protection to abstract ideas. (*Weitzenkorn* v. *Lesser* (1953), 40 Cal.2d 778, 788-789 [256 P.2d 947].) This accords with the general weight of authority. (See generally, Nimmer, *'The Law of Ideas,'* (1954) 27 So.Cal.L.Rev. 120 et seq. and cases cited.) 'There may be literary property in a particular combination of ideas [and this must presuppose an expression thereof] or in the form in which ideas are embodied. There can be none in the ideas.' (*Fendler* v. *Morosco* (1930) 253 N.Y. 281, 287 [171 N.E. 56, 58].) Neither common law nor statutory copyright extends protection to an idea as such. '[O]nly in the "expression" of a copyrighted work does any monoply inhere; the "theme," the "plot," the "ideas" may always be freely borrowed.' (*Dellar* v. *Samuel Goldwyn, Inc.* (1945, 2d C.C.A.), 150 F.2d 612.)

"The principles above stated do not, however, lead to the conclusion that ideas cannot be a subject of contract. As Mr. Justice Traynor stated in his dissenting opinion in *Stanley* v. *Columbia Broadcasting System* (1950), *supra,* 35 Cal.2d 653, 674 [221 P.2d 73, 23 A.L.R.2d 216]: 'The policy

that precludes protection of an abstract idea by copyright does not prevent its protection by contract. Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed. That disclosure may therefore be consideration for a promise to pay . . . Even though the idea disclosed may be "widely known and generally understood" [citation], it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty.' (*Cf. Brunner* v. *Stix, Baer & Fuller Co.* (1944), 352 Mo. 1225 [181 S.W.2d 643, 646]; *Schonwald* v. *F. Burkart Mfg. Co.* (1947), 356 Mo. 435 [202 S.W.2d 7].) Amici supporting plaintiff add, 'If a studio wishes to have an idea disclosed to it and finds that idea of sufficient value to make use of it, it is difficult to see how any hardship is involved in requiring payment of the reasonable value of the material submitted.' The principles enunciated in the above quotation from Justice Traynor's dissent are accepted as the law of California (*Weitzenkorn* v. *Lesser* (1953), *supra,* 40 Cal.2d 778, 791-792) and we have no quarrel with amici's postulation. This case, however, remains to be resolved.

"The lawyer or doctor who applies specialized knowledge to a state of facts and gives advice for a fee is selling and conveying an idea. In doing that he is rendering a service. The lawyer and doctor have no property rights in their ideas, as such, but they do not ordinarily convey them without solicitation by client or patient. Usually the parties will expressly contract for the performance of and payment for such services, but, in the absence of an express contract, when the service is requested and rendered the law does not hesitate to infer or imply a promise to compensate for it. (See *Buck* v. *City of Eureka* (1899), 124 Cal. 61, 66 [56 P. 612]; *Zumwalt* v. *Schwarz* (1931), 112 Cal.App. 734, 736 [297 P. 608]; *People's Nat. Bank* v. *Geisthardt* (1898), 55 Neb. 232, 237-238 [75 N.W. 582]; 6 Cal.Jur.2d 378, § 181; 5 Am.Jur. 351, § 153; 41 Am.Jur. 256, § 142; 7 C.J.S. 1078, § 190(b); 70 C.J.S. 1023, § 68; see also *Long* v. *Rumsey* (1938), 12 Cal.2d 334, 341-342 [84 P.2d 146].) In other words the recovery may be based on contract either express or implied. The person who can and does convey a valuable idea to a producer who commercially solicits the service or who voluntarily accepts it knowing that it is tendered for a price should likewise be entitled to recover. In so holding we do not fail to recognize that free-lance writers are not necessarily members of a learned profession and as such bound to the exalted standards to which doctors and lawyers are dedicated. So too we are not oblivious of the hazards with which producers of the class represented here by defendants and their related amici are confronted through the unsolicited submission of numerous scripts on public domain materials in which public materials the producers through their own initiative may well find nuclei for legitimately developing the 'stupendous

and colossal.' The law, however, is dedicated to the proposition that for every wrong there is a remedy (Civ. Code, § 3523) and for the sake of protecting one party it must not close the forum to the other. It will hear both and seek to judge the cause by standards fair to both. To that end the law of implied contracts assumes particular importance in literary idea and property controversies.

"*The Law Pertaining to Contracts, Express, Implied-in-Fact and Implied by Law, and Quasi Contractual Obligations, as Related to Ideas and Literary Property.* The parties and amici, from their several viewpoints, discuss the law of contracts and caution us not to confuse the rules insofar as such rules may differentiate respectively among contracts which are express or implied-in-fact or implied-in-law, meaning by the latter expression to denote· a quasi-contractual obligation imposed by law. We agree that whether a contract be properly identified as express or as implied-in-fact or inferred from circumstances; or whether the bargain meets the subjective test of a meeting of minds or is held to reside in the objective evidence of words and acts with or without a meeting of minds; or whether the obligation be recognized as implied by law from acts having consensual aspects (and therefore often termed implied-in-fact); or whether the obligation be imposed by law because of acts and intents which, although tortious rather than consensual, should in justice give rise to an obligation resembling that created by contract and, hence, should be termed quasi-contractual, is important here to the extent that we recognize the situations and discriminate appropriately in the governing rules.

"An eminent writer says that 'The elements requisite for an informal contract . . . are identical whether they are expressly stated or implied in fact,' citing e.g., *Lombard* v. *Rahilly* (1914), 127 Minn. 449 [149 N.W. 950], holding 'A "contract implied in fact" requires a meeting of the minds, an agreement, just as much as an "express contract"; the difference between the two being largely in the character of the evidence by which they are established'; see also *Silva* v. *Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773 [97 P.2d 798]. (Williston on Contracts, rev. ed., vol. 1, p. 8.) The same author describes quasi contracts by declaring that 'as quasi contractual obligations are imposed by the law for the purpose of bringing about justice without reference to the intention of the parties, the only apparent restriction upon the power of the law to create such obligations is that they must be of such a sort as would have been appropriately enforced under common-law procedure by a contractual action. Indeed even this limitation is too narrow, for a bill in equity or a libel in admiralty might be the appropriate means of enforcing some quasi contractual obligations. As the law may impose any obligations that justice requires, the only limit in the last analysis to the category of quasi contracts is that the obligation in question more closely

resembles those created by contract than those created by tort. On the other hand, a true contract cannot exist, however desirable it might be to have one, unless there is a manifestation of assent to the making of a promise. Furthermore, the measure of damages appropriate to contractual obligations differs from that applicable to quasi contracts . . . It is also true that quasi contractual obligations are not so universally based on unjust enrichment or benefit as is sometimes supposed. There are many cases where the law enforces in a contractual action a duty to restore the plaintiff to a former status—not merely to surrender the benefit which the defendant has received.'

"If it were not for precedent we should hesitate to speak of an implied-in-fact contract. In truth, contracts are either made in fact or the obligation is implied in law. If made in fact, contracts may be established by direct evidence or they may be inferred from circumstantial evidence. The only difference is in the method of proof. In either case they would appear to be express contracts. Otherwise, it would seem that they, or the presumed contractual obligation, must be implied at law. A so-called 'implied-in-fact' contract, however, as the term is used by some writers, may be found although there has been no meeting of the minds. Even an express contract may be found where there has been no meeting of minds. The classic example of this situation is set up by the parol evidence rule. The law accepts the objective evidence of the written contract as constituting the contract and, subject, of course, to certain exceptions, precludes oral evidence to show that the minds of the parties did not meet in the writing. Professor Williston recognizes in effect, if not specifically, that the law implies (or construes) contractual obligations in many cases where there is no true contract in the historically conventional sense and that such implied obligations are of the nature of, and governed by the rules applicahle to, contracts termed implied-in-fact by many writers. In a paper published in 14 Illinois Law Review 85, 90, Mr. Williston says: 'The parties may be bound by the terms of an offer even though the offeree expressly indicated dissent, provided his action could only lawfully mean assent. A buyer who goes into a shop and asks and is given [told] the price of an article, cannot take it and say "I decline to pay the price you ask, but will take it at its fair value." He will be liable, if the seller elects to hold him so liable, not simply as a converter for the fair value of the property, but as a buyer for the stated price.' (See *Lucy* v. *Mouflet* (1860), 5 H. & N. 229, 232; *Wilcox, Ives & Co.* v. *Rogers* (1913), 13 Ga.App. 410 [79 S.E. 219]; Rest., Contracts, § 5, p. 7; § 72(2), p. 77.) Concerning the same subject Professor Costigan, in a paper published in 33 Harvard Law Review 376, at 398, states his view: 'Professor Williston is absolutely right in his contention tht the no-meeting-of-the-minds express contracts—the objective but not subjecive test contracts—

are properly to be denominated contracts instead of quasi-contracts, and the reason for that concession was that on their breach the normal contract measure of damages is applied. But that same reason has led us to the further conclusion that there are genuine implied-in-fact contracts of both the meeting-of-the-minds and the no-meeting-of-the-minds varieties.'

"Whether the resulting 'contract' in the cases discussed by the learned professors is classified as express (as may be fictionized by the law's objective test) or as implied-in-fact (as also may be fictionized by the law) or whether in the same or slightly differing circumstances an obligation shall be 'implied' and denominated 'quasi contractual' because it is strong-armed by the law from nonconsensual acts and intents, is probably important in California—and for the purposes of resolving the problems now before us—principally as an aid to understanding the significance of rulings and discussions in authorities from other jurisdictions. Here, our terminology and the situations for application of the pertinent rules are simplied by codification.

"Our Civil Code declares that (§ 1619) 'A contract is either express or implied'; (§ 1620) 'An express contract is one, the terms of which are stated in words' and (§ 1621) 'An implied contract is one, the existence and terms of which are manifested by conduct.' The same code further provides that (§ 1584) '[T]he acceptance of the consideration offered with a proposal, is an acceptance of the proposal'; (§ 1589) 'A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the persons accepting'; (§ 1605) 'Any benefit conferred . . . upon the promisor, by any other person, to which the promisor is not lawfully entitled . . . is a good consideration for a promise'; and (§ 1606) '[A] moral obligation originating in some benefit conferred upon the promisor . . . is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise.' (See also *Silva* v. *Providence Hospital of Oakland* (1939), *supra*, 14 Cal.2d 762, 773, and cases there cited; *Horacek* v. *Smith* (1948), 33 Cal.2d 186, 194 [11] [199 P.2d 929]; *Yadkoe* v. *Fields* (1944), 66 Cal.App.2d 150, 158-159 [151 P.2d 906]; Rest., Contracts, §§ 5, 72 (2); 12 Cal.Jur.2d 186-189.)

"From what has been shown respecting the law of ideas and of contracts we conclude that conveyance of an idea can constitute valuable consideration and can be bargained for before it is disclosed to the proposed purchaser, but once it is conveyed, i.e., disclosed to him and he has grasped it, it is henceforth his own and he may work with it and use it as he sees fit. In the field of entertainment the producer may properly and validly agree that he will pay for the service of conveying to him ideas which are valuable and which he can put to profitable use. Furthermore, where an idea has been

conveyed with the expectation by the purveyor that compensation will be paid if the idea is used, there is no reason why the producer who has been the beneficiary of the conveyance of such an idea, and who finds it valuable and is profiting by it, may not then for the first time, although he is not at that time under any legal obligation so to do, promise to pay a reasonable compensation for that idea—that is, for the past service of furnishing it to him—and thus create a valid obligation. As said in 12 American Jurisprudence 603, section 110, 'there is considerable authority which supports the view that the moral obligation arising from a benefit of a material or pecuniary kind conferred upon the promisor by past services, rendered in the expectation that they were to be paid for—or, at least, if rendered upon the assumption by the person rendering them, though mistaken, that they would create a real liability—and, otherwise, in circumstances creating a moral obligation on the part of the promisor to pay for the same, will support an executory promise to do so, although there was, previous to such promise, no legal liability or promise, perfect or imperfect.' (See also Civ Code, §§ 1605, 1606, quoted *supra,* p. 802; *Edson* v. *Poppe* (1910), 24 S.D. 466 [124 N.W. 441, 26 L.R.A.N.S. 534]; *Bailey* v. *City of Philadelphia* (1895), 167 Pa. 569 [31 A. 925, 46 Am.St.Rep. 691]; *Gray* v. *Hamil* (1889), 82 Ga. 375 [10 S.E. 205, 6 L.R.A. 72]; *Credit Bureau of San Diego* v. *Johnson* (1943) 61 Cal.App.2d Supp. 834, 839 [142 P.2d 963]; 17 A.L.R. 1366-1371, s. 79 A.L.R. 1354; 53 L.R.A. 371-376; 26 L.R.A. N.S. 526.) But, assuming legality of consideration, the idea purveyor cannot prevail in an action to recover compensation for an abstract idea unless (a) before or after disclosure he has obtained an express promise to pay, or (b) the circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances, show a promise of the type usually referred to as 'implied' or 'implied-in-fact.' (See *Weitzenkorn* v. *Lesser* (1953), *supra,* 40 Cal.2d 778, 794-795; *Elfenbein* v. *Luckenbach Terminals* (1933), 111 N.J.L. 67 [166 A. 91, 93].) That is, if the idea purveyor has clearly conditioned his offer to convey the idea upon an obligation to pay for it if it is used by the offeree and the offeree, knowing the condition before he knows the idea, voluntarily accepts its disclosure (necessarily on the specified basis) and finds it valuable and uses it, the law will either apply the objective test (discussed, *supra,* pp. 801-802) and hold that the parties have made an express (sometimes called implied-in-fact) contract, or under those circumstances, as some writers view it, the law itself, to prevent fraud and unjust enrichment, will imply a promise to compensate.

"Such inferred or implied promise, if it is to be found at all, must be based on circumstances which were known to the producer at and preceding the time of disclosure of the idea to him and he must voluntarily accept

the disclosure, knowing the conditions on which it is tendered. Section 1584 of the Civil Code ('[T]he acceptance of the consideration offered with a proposal, is an acceptance of the proposal') can have no application unless the offeree has an opportunity to reject the consideration—the proffered conveyance of the idea—before it is conveyed. Unless the offeree has opportunity to reject he cannot be said to accept. (*Cf. People* v. *Forbath* (1935), 5 Cal.App.2d Supp. 767, 769-770 [42 P.2d 108]; *County of Ventura* v. *Southern Calif. Edison Co.* (1948), 85 Cal.App.2d 529, 532 [193 P.2d 512]; *Krum* v. *Malloy* (1943), 22 Cal.2d 132, 135 [137 P.2d 18].) The idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power. The law will not in any event, from demands stated subsequent to the unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure. The law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue. So, if the plaintiff here is claiming only for the conveyance of the idea of making a dramatic production out of the life of Floyd Collins he must fail unless in conformity with the above stated rules he can establish a contract to pay." (*Desny* v. *Wilder, supra,* 46 Cal.2d 715, 731-739.)

 It is held that ". . . if a producer obligates himself to pay for the disclosure of an idea, whether it is for protectible or unprotectible material, in return for a disclosure thereof he should be compelled to hold to his promise. There is nothing unreasonable in the assumption that a producer would obligate himself to pay for the disclosure of an idea which he would otherwise be legally free to use, but which in fact, he would be unable to use but for the disclosure.

 "The producer and the writer should be free to make any contract they desire to make with reference to the buying of the ideas of the writer; the fact that the producer may later determine, with a little thinking, that he could have had the same ideas and could thereby have saved considerable money for himself, is no defense against the claim of the writer. This is so even though the material to be purchased is abstract and unprotected material." (*Chandler* v. *Roach,* 156 Cal.App.2d 435, 441-442 [319 P.2d 776].) An idea which can be the subject matter of a contract need not be novel or concrete. (*Donahue* v. *Ziv Television Programs, Inc.,* 245 Cal. App.2d 593, 600 [54 Cal.Rptr. 130]; *Minniear* v. *Tors,* 266 Cal.App.2d 495, 502 [72 Cal.Rptr. 287].)

It may be noted here that the law of the State of New York no longer requires that an idea be "novel" in order to be the subject of contract pro-

tection. As stated in *Frederick Chusid & Co.* v. *Marshall Leeman & Co.* (S.D.N.Y. 1968) 279 F.Supp. 913, 917: "Under New York law the parties have the right by contract to prevent disclosure of such materials, even though they are not secret or confidential and may indeed be a matter of public knowledge." The court in *Krisel* v. *Duran* (S.D.N.Y. 1966) 258 F. Supp. 845, 860 stated: "Under New York law, an idea, if valuable, even though it does not contain novel, secret or confidential material, may be protected by such an agreement. This doctrine applies even when the subject matter of the idea is common or open to public knowledge."

We are of the opinion that appellant's idea of the filming of Shakespeare's play "The Taming of the Shrew" is one which may be protected by contract.

Express or implied contracts both are based upon the intention of the parties and are distinguishable only in the manifestation of assent. The making of an agreement may be inferred by proof of conduct as well as by proof of the use of words. (12 Cal.Jur.2d, Contracts, § 4, p. 186.) Whether or not the appellant and respondents here, by their oral declarations and conduct, as shown by the depositions and affidavits, entered into a contract whereby respondents agreed to compensate appellant in the event respondents used appellant's idea, is a question of fact which may not be properly resolved in a summary judgment proceeding, but must be resolved upon a trial of the issue. (Cf. *Silva* v. *Providence Hospital of Oakland,* 14 Cal.2d 762, 774 [97 P.2d 798].) Even where a question of interpretation of contractual provisions is involved on a motion for summary judgment, it is settled that, if the opposing interpretations are both reasonable, a question of fact is raised which precludes summary judgment. (*Walsh* v. *Walsh,* 18 Cal.2d 439, 443-444 [116 P.2d 62].)

*Statute of Frauds.* Respondents urge that the agreement is barred by the statute of frauds, section 1624 subdivision 1 of the Civil Code.[1]

The application of section 1624 subdivision 1 of the Civil Code to the transaction here under consideration rests upon a triable issue of fact. The trier of fact might conclude that from the negotiations and conduct of the parties and their agents there was an implied contract. That is, the respondents may be found to have made an implied promise of payment, conditioned upon subsequent use, in return for appellant's act of disclosing his idea—not in return for his promise to disclose such idea. This being a

---

[1]Section 1624 of the Civil Code provides in pertinent part that: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent:

"1. An agreement that by its terms is not to be performed within a year from the making thereof."

unilateral contract (a promise for an act—see Rest., Contracts, §§ 12 and 55), it does not fall within the section of the statute of frauds dealing with contracts not to be performed within one year. (Rest., Contracts, § 198, com. a.) If the trial court should find that appellant disclosed his idea to respondents on the condition that respondents would not use the idea unless they compensated appellant for such use, and respondents accepted the disclosure on that condition, then the compensation would, at respondents' option, take one of two forms: they would engage appellant as producer of the film or pay him the monetary equivalent. Since it appears from the record that appellant has made his disclosure and respondents have elected not to engage him as producer of the film, all that remains to be done is payment by respondents. ▆ Where a contract has been fully performed by one party and nothing remains to be done except the payment of money by the other party, the statute of frauds is inapplicable. (*Dutton* v. *Interstate Inv. Corp.,* 19 Cal.2d 65, 70 [119 P.2d 138]; 1 Witkin, Summary of Cal. Law (1960) Contracts, § 97, p. 105.) ▆ Furthermore, to fall under the bar of subdivision 1 of section 1624 of the Civil Code, the contract must, by its terms, be impossible of performance within a year. If it is unlikely that it will be so performed, or the period of performance is indefinite, the statute does not apply. (1 Witkin, Summary of Cal. Law (1954) Contracts, § 95, p. 103.)

*Statute of Limitations.* Respondents urge that the action is barred by the provisions of section 339 subdivision 1 of the Code of Civil Procedure.[2]

This raises the question as to when the cause of action accrued. This depends on the nature of respondents' obligation, if any, to appellant.

Appellant, in his affidavit, filed in opposition to the motion for summary judgment, states: "However, when I disclosed my ideas to defendants and their representatives, I did not intend to confer a gratuity on them. Nor did I intend to make them a gift of my services. They were not merely actors but competitors of mine in the business of producing films. I made the disclosures and rendered the services with the expectation and understanding that in the event defendants used my ideas and went forwards with production of a film version of THE TAMING OF THE SHREW, I would be engaged as producer of the film at my then going rate and receive the usual screen and advertising credits as such producer, or I would receive the monetary equivalent of such compensation and credit. By their words and acts, defendants and their representatives demonstrated—at the various times

---

[2]Section 339, Code of Civil Procedure, reads in pertinent part as follows: "Within two years: 1. An action upon a contract, obligation or liability not founded upon an instrument of writing, other than that mentioned in subdivision 2 of section 337 of this Code; . . ."

they solicited my disclosures and services—that they knew I expected to be the producer and receive compensation and credit therefor, or receive the monetary equivalent thereof."

If the trial court should find that the condition under which appellant disclosed his idea, and the condition which was impliedly agreed to by respondents was "that in the event defendants used my ideas and went forword with production of a film version of THE TAMING OF THE SHREW, I would be engaged as producer of the film at my then going rate and receive the usual screen and advertising credits as such producer, or I would receive the monetary equivalent of such compensation and credit," then appellant would not have a right to actually participate as the producer, but would only have the obligation so to do as a condition of his right to payment. But as long as he was prepared to render such services, respondents remained obligated to pay the monetary equivalent of what he would have received had he, in fact, rendered such services, even if respondents elected not to use his services. Respondents' obligation to pay is triggered not by the use of appellant's services as a producer, but rather by their use of appellant's idea.

The question arises as to when, within the meaning of the implied promise, if the court should find such a promise, respondents may be held to have used appellant's idea. This again raises an issue of fact turning on the manifested intent of the parties. A trier of fact might conclude that such a use was intended to occur the moment a preliminary script is written embodying appellant's idea, even if in fact no motion picture production, based upon such script, ever occurs. The court might also find that the implied promise to pay arose upon respondents' disclosure of the idea to a substantial segment of the public since such use would tend to destroy any further marketability of the idea. (See *Thompson* v. *California Brewing Co.,* 191 Cal.App.2d 506, 510 [12 Cal.Rptr. 783]; *Donahue* v. *Ziv Television Programs, Inc.,* 245 Cal.App.2d 593, 611 [54 Cal.Rptr. 130].) ▮▮▮ The record discloses that the motion picture "The Taming of the Shrew" was first released to the public in or about March 1967. Appellant's action was commenced November 14, 1967. Since the trier of fact might conclude that the date of release of the picture to the general public was the use intended by the parties to trigger respondents' obligation to pay, it is impermissible to find on motion for summary judgment that appellant's cause of action is barred by the two year statute of limitations.

*Confidential Relationship.* Respondents urge that the record is devoid of any evidence tending to establish the fact that they breached a duty of confidence owed to appellant.

▮▮▮ Appellant, in his affidavit, stated: "Because I knew Mr. French to

be a highly reputable agent, had had prior dealings with him, had the same firm of attorneys as the Burtons and had been the recipient of an invitation, constantly renewed, to disclose my ideas and render services on the project, I reposed trust and confidence in the Burtons and their representatives and expected that my ideas would be kept in confidence by them. I did not expect or intend that defendants would go forward with production of "SHREW" and make use of my ideas without my participation."

Under the rules governing the granting of a summary judgment, the foregoing declaration on the part of appellant, made in opposition to the motion for summary judgment, is sufficient to raise a triable issue of fact as to whether the disclosure of his idea to respondents was made in confidence, and was accepted by respondents upon the understanding that they would not use it without the consent of appellant. (Cf. *Thompson* v. *California Brewing Co.,* 150 Cal.App.2d 469, 474 [310 P.2d 436].)

The judgment is reversed.

Stephens, Acting P. J., and Aiso, J., concurred.