JOHN SZCZESNY, Plaintiff-Appellant, *v.* W.G.N. CONTINENTAL BROADCASTING CORPORATION *et al.*, Defendants-Appellees.

First District (4th Division)    Nos. 62572, 62904 cons.

Opinion filed October 27, 1977.—Rehearing denied December 8, 1977.

Joel S. Ostrow, of Chicago, for appellant.

Jay Erens, William E. Rattner, and Steven L. Harris, all of Levy and Erens, of Chicago, for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

This appeal involves an action by John Szczesny (plaintiff) for infringement of a common law copyright and for breach of an implied contract for use of the subject matter of that copyright by defendants W.G.N. Continental Broadcasting Corporation (W.G.N.) and Jewel

Companies, Incorporated (Jewel). Before trial, summary judgment was entered for the defendants, but on appeal of that order this court reversed and remanded for trial, finding that a material issue of fact remained, thus precluding summary judgment. (*Szczesny v. W.G.N. Continental Broadcasting Corp.* (1974), 20 Ill. App. 3d 607, 315 N.E.2d 263.) On remand the matter proceeded to trial and the jury found for the defendants. Plaintiff then brought this appeal, alleging three grounds for reversal: (1) defendants failed to establish the affirmative defense of independent development of their program; (2) the jury was erroneously instructed that a contract for the use of an idea is valid only when the idea submitted was novel; (3) the trial court erred in submitting to the jury two special interrogatories which asked for findings of evidentiary rather than ultimate facts.

We affirm the judgment of the trial court.

At trial plaintiff testified that in February 1959 he telephoned Bruce Dennis at W.G.N. about a television program idea involving horse racing.[1] Dennis sent the plaintiff a release form with a cover letter indicating that W.G.N. required submission of the signed release form along with a description of the idea being submitted. Plaintiff modified the language of the release form, signed it, and sent it to Dennis along with a two page letter listing a number of program ideas. One of those ideas was:

> "Another method which would be easily adaptable to T.V. would be the actual filming of the races as they are run at any race track. In this method people at home can be included in a nationwide game, numbered cards can be used the same as described above. The number of races can be prearranged on each card, with the cards having different combinations of numbers, for each race. There can be one winner for each race, or it can be done as it is at the race track, WIN, PLACE OR SHOW. The awards being lesser for place and show, the money could be the actual mutuels or any prearranged amounts."

Dennis then sent the plaintiff a letter acknowledging receipt of the letter and stating that W.G.N. was not soliciting new program material and would not be able to consider additions to their schedule.

In January 1967 plaintiff viewed a television program broadcast by W.G.N. entitled "Let's Go To The Races." This was a weekly game show sponsored by Jewel. On each telecast films of five horse races were shown. Tickets available to the public at Jewel stores listed one horse by number for each race. The tickets were coded by number and color for each week's program. The television viewer whose card number for a

---

[1] Dennis, radio program manager at W.G.N. in 1959, died prior to trial.

race matched the number of the winning horse in that race could redeem a cash prize at Jewel. Plaintiff believed that his program suggestion was the basis of the show and he ultimately instituted the action now before us.

Defendants presented the testimony of Walter Schwimmer, a television producer who developed programs and sold them to individual stations, networks, and advertising agencies. This involved the creation of an original idea and its development into a completed film program for sale. Schwimmer testified that in 1956 he and his program director, Arthur Pickens, began to develop the idea of a horse racing television show. They designed their own methods of filming actual horse races so as to enable the viewer to better follow the progress of an individual horse. In 1958 they made a film of a horse race at a local race track using those techniques.

At the same time Schwimmer was working on the audience participation aspect of the show, which he had perceived from the outset as being crucial to the show's success. In an undated memorandum, which Schwimmer recalled writing in the fall of 1958, he outlined his plans at the time for the show, which would consist of five filmed races. Home viewers could pick up a ticket at retail outlets on which they could write in the numbers of the horses they thought would win. The tickets would be mailed in for determination of winners. Later in 1958 Schwimmer and his associates determined that it would be too expensive to process all those mailed entries. Late that year, or at least within the first two months of 1959, they decided that the cards should already have the numbers printed on them when they were distributed so that only the winning cards would be mailed, thereby saving much of the processing expense.

In March of 1959 Schwimmer mailed a letter, which he described as a trial balloon, to a number of television stations requesting their reaction to his idea for a television show involving filmed horse races. The only audience participation feature proposed was that viewers could get copies of the racing program for each race prior to the broadcast. Indeed, the letter specifically stated that no prizes would be involved. At trial Schwimmer explained that he only wanted the stations' reactions to the racing aspect of the show. He was aware of possible problems with the Federal Communications Commission concerning the broadcasting of gambling-related events and he did not wish the stations to react to that aspect.

Further development of the show was delayed while an F.C.C. ruling on its legality was sought. In 1962 when such programs were finally approved, Schwimmer made the decision to produce the show and attempt to sell it to sponsors. That same year he first approached Joseph Klinge, involved in special promotions at Jewel, about the show. Klinge

was interested but wanted to see how the program worked out in other areas. The program was eventually sold to Jewel in 1966 after it had run in a number of other cities.

Schwimmer testified that although he knew Bruce Dennis when Dennis served as the news director of W.G.N. television in 1962 and 1963, Dennis never mentioned plaintiff, plaintiff's letter, or anything about a television show on horse racing. Nor was Schwimmer ever told by any other employees of W.G.N. about plaintiff or plaintiff's idea. On cross-examination he stated that he did not recall discussing his idea for the show with W.G.N. employees although he might have done so. But he categorically stated that no one from W.G.N. had ever told him that they had received an idea which was similar to his. More broadly, Schwimmer stated that prior to the filing of the lawsuit no one had spoken to him about plaintiff or plaintiff's idea; nor had he seen the plaintiff's letter.

Arthur Pickens, who worked for Schwimmer during the development of the program, corroborated Schwimmer's testimony about the process of that development. Beginning in 1955 Pickens, Schwimmer, and a third man, Bernie Cross, developed the concept of showing horse racing on television. He too recalled that in 1958 they decided to use cards preprinted with the horses' numbers because of the cost of processing entries if people wrote in entries. Following F.C.C. approval in 1962 they began to attempt to sell the program to retail chains doing business in local markets. The show was first sold to a food store chain in Minneapolis and was broadcast there in 1963. In 1966 Jewel took an option on the show, and ultimately purchased time on W.G.N. Prior to Jewel's selection of W.G.N. Pickens never spoke with any W.G.N. employees concerning a horse racing program. Nor did he know of any instance in which a member of his industry purchased an idea or a format as opposed to a packaged production.

Joseph Klinge, involved in special promotions at Jewel, testified that he first heard of the program in 1963 when he was approached by Schwimmer. In 1966 when Jewel bought the show they asked the Earle Ludgin Agency to procure air time. The agency was given an order of preference for stations, with W.G.N. being last on the list. W.G.N. was ultimately selected. Prior to that selection Klinge never spoke with a member of W.G.N. concerning a horse racing program. Before the lawsuit commenced he had never heard of plaintiff or any of plaintiff's ideas.

Naomi Bundsgaard testified that she handled most of Jewel's advertising for "Let's Go To The Races" as a member of the Ludgin Agency. W.G.N., their last choice for a station, was the only one they could get. Nobody from W.G.N. had input into the contents of the show. Before the lawsuit she had not heard of the plaintiff or of any of his ideas.

Sheldon Cooper testified that in 1966 as program manager at W.G.N. he was involved in the decision to sell air time for the show to Jewel. He knew Bruce Dennis, who was radio program manager of W.G.N. in 1959. Dennis never mentioned plaintiff or plaintiff's ideas to Cooper. Indeed, prior to 1966 Dennis never mentioned anything about a horse racing program to Cooper. Cooper testified further that in 1959 W.G.N.'s radio and television departments were separate and were in competition with each other for clients and did not share program ideas. Cooper knew of no instance in which W.G.N. bought an idea or format for a television program as opposed to a complete packaged program.

Donald Knautz testified that in 1967 he was in charge of taping "Let's Go To The Races" for W.G.N. He too stated that W.G.N. had no input into the contents of the program; it only provided the air time and telecast the show. He knew Dennis, having worked with him, but Dennis never mentioned plaintiff or any idea of plaintiff to him.

I.

■■■ As was stated in the first appeal of this matter:

"In the field of common-law copyright, an idea is entitled to protection as a property right where the idea is novel or original, where it has been reduced to expression in a concrete form, and where the creator of the idea has not published it or consented to its publication. * * * [Citation.] Where such a protectible property right is appropriated, a cause of action for common law copyright infringement based upon a tort theory or a quasi-contract theory arises. In order to recover plaintiff must prove copying by defendant. An inference of copying arises upon a showing of substantial similarity between plaintiff's work and defendant's work and access to plaintiff's work by defendant." (*Szczesny v. W.G.N.* (1974), 20 Ill. App. 3d 607, 612, 315 N.E.2d 263, 267.)

This inference of copying is conclusively rebutted by proof that a defendant independently developed the subject matter of the common law copyright. (*Roberts v. Dahl* (1972), 6 Ill. App. 3d 395, 286 N.E.2d 51.) Plaintiff suggests in his brief that in *Szczesny* the appellate court determined that he did have a common law copyright in his idea and he had raised an inference of copying with his evidence of similarity and access. While the court did make those findings, it did so on the basis of a review of the pleadings as part of a determination of the validity of the trial court's entry of summary judgment for defendants. The court specifically stated that its "sole function" on review of that order was to determine whether no genuine issue of material fact had been raised for trial. (*Szczesny*, 20 Ill. App. 3d 607, 613, 315 N.E.2d 263, 267-68.) It then

determined that defendants' evidence of independent development lacked proof of Schwimmer's refinement of the audience participation portion of his program. Specifically, there was no evidence of how and when Schwimmer decided to have numbers preprinted on his cards rather than having the public attempt to select the winners. Because of this finding the court held that the defense of independent development was " * * * * an issue of fact to be determined upon a trial" and it remanded with instructions only to set the cause for trial. Our review of the trial record establishes that evidence, arguments, and instructions were presented as to all the issues, without objection from the plaintiff concerning prior determination of any of those issues by the appellate court. Nor has plaintiff argued before this court that he was in any way prejudiced by trial on all the issues.

■■ In any event we need not decide whether this court's determinations on the issues of existence of a common law copyright and the inference of access should have precluded litigation of those issues. We find that the evidence clearly supports the jury's determination that Schwimmer independently developed "Let's Go To The Races." Schwimmer and his former associate, Arthur Pickens, testified that they began to develop the concept of the show in 1955 or 1956, years before plaintiff submitted his idea. They also testified that by 1958, or at the latest in the first two months of 1959, they had refined the concept to include the use of cards preprinted with the numbers of the horses, so as to reduce the cost of the audience participation aspect of the show. Thus evidence was presented establishing the specific details of refinement which the appellate court had found wanting in the pleadings. Their uncontradicted testimony established that by February 18, 1959, when plaintiff submitted his idea to W.G.N., they had already developed all the aspects contained in his suggestion and had also developed the filming techniques which they believed were necessary to the show. Additionally, defendants presented the testimony of Klinge, from Jewel, Bundsgaard, from Jewel's advertising agency, and Cooper and Knautz from W.G.N. Each of these people was involved in the production of the show, and each denied hearing of plaintiff or his idea prior to institution of this action. In response to a special interrogatory the jury found that "Let's Go To The Races" was developed independently of and without resorting to plaintiff's letter of February 18, 1959. That finding was amply supported by the evidence and of course necessitated a finding for defendants on all counts. Since plaintiff has failed to demonstrate that the verdict was contrary to the manifest weight of the evidence, it cannot be reversed on that ground. *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63; *appeal dismissed, cert. denied* (1959), 361 U.S. 127, 4 L. Ed. 3d 180, 80 S. Ct. 256.

## II.

Plaintiff alleges error in the giving of one of the instructions and two of the special interrogatories to the jury. The instruction at issue stated:

"A contract for the use of an idea is not valid unless the idea as submitted was novel, original and concrete. * * * When I use the word 'novel' in these instructions to refer to an idea, I mean that the idea did not previously exist."

The two interrogatories at issue were:

"(1) Were the contents of plaintiff's letter of February 18, 1959, novel?

(2) Did the defendant WGN use the contents of plaintiff's letter of February 18, 1959 in connection with 'Let's Go To The Races?' "

The jury answered both interrogatories in the negative.

■■ Plaintiff made no objections to these items at the conference on instructions. By not doing so he deprived the trial judge of the opportunity to correct what plaintiff perceived as error. Case law is clear that by not making such objections at the conference on instructions plaintiff waived any objections as to instructions (*Lewis v. Hull House Association* (1975), 25 Ill. App. 3d 617, 323 N.E.2d 600), and special interrogatories. *Havlovic v. Scilingo* (1972), 7 Ill. App. 3d 918, 289 N.E.2d 79.

■■ We also note that the instruction requiring novelty represents the traditional view on the elements of an action for breach of an implied contract for use of an idea protected by common law copyright. (*Marcus Advertising, Inc. v. M. M. Fisher Associates, Inc.* (7th Cir. 1971), 444 F.2d 1061; *Boop v. Ford Motor Co.* (7th Cir. 1960), 278 F.2d 197; *Downey v. General Foods Corp.* (1972), 31 N.Y.2d 56, 286 N.E.2d 257, 334 N.Y.S.2d 874; see generally the discussion and cases cited in 2 Nimmer on Copyright §173.2 (1976).) Although this requirement has been rejected in at least one jurisdiction (*Blaustein v. Burton* (1970), 9 Cal. App. 3d 161, 88 Cal. Rptr. 319; see 2 Nimmer §173.2), it nonetheless remains the traditional view. Further, our determination that the issue in this cause has been waived precludes further evaluation of this approach.

■■ ■ In objecting to the special interrogatories quoted earlier plaintiff correctly states the law that such interrogatories must relate to ultimate facts whose determination could be inconsistent with a general verdict in the case. (*Le Flore v. Chicago Transit Authority* (1973), 12 Ill. App. 3d 71, 297 N.E.2d 758.) Clearly the interrogatories at issue meet that test. As we have noted a determination of lack of novelty in the idea would preclude a finding for plaintiff on his contractual claim. A finding that defendant W.G.N. did not use the contents of plaintiff's letter would preclude recovery on either of plaintiff's theories: it would negate the copying element of the infringement of common law copyright claim and

it would establish that there was no breach of an implied contract to pay for use of the idea. Therefore, even though plaintiff has been deemed to have waived this issue, we note as an independent basis for affirmance that the special interrogatories were properly directed towards ultimate facts in the case. Nor do we find merit in plaintiff's claim that the interrogatory on novelty, which related back to the instruction concerning plaintiff's contractual claim, could have confused the jury into thinking that this was a requirement for his infringement of copyright claim as well. The instruction which dealt with novelty clearly referred only to a contract for the use of an idea. The instructions pertaining to plaintiff's common law copyright claim did not mention novelty. Furthermore, plaintiff has not established any prejudice resulting from this interrogatory. The jury's response to the interrogatory on use of plaintiff's idea precluded any recovery by plaintiff regardless of any determination concerning novelty of that idea. Without such a showing of prejudice plaintiff cannot base his claim for relief on that alleged error. *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.